**UNITED STATES of America**

v.

**Rosario GAMBINO, Erasmo Gambino, Anthony Spatola, Antonio Gambino and Mario Gambino, Defendants.**

**Crim. No. 84–98.**

United States District Court,
D. New Jersey.

Nov. 19, 1984.

W. Hunt Dumont, U.S. Atty. by Marianne Espinosa Murphy, & Edward J. Bilinkas, Asst. U.S. Attys., Newark, N.J., for the Government.

Jacob R. Evseroff, Brooklyn, N.Y., for defendant Rosario Gambino.

Ronald P. Fischetti, New York City, for defendant Erasmo Gambino.

Adolph Galluccio, Paterson, N.J., for defendant Anthony Spatola.

Ira Friedman, New York City, for defendant Antonio Gambino.

Charles Carnesi, Brooklyn, N.Y., for defendant Mario Gambino.

---

**1.** Transcript citations are to the volume number and page. E.g., 8 Tr. 1447 refers to Volume 8, p.

## OPINION

LACEY, District Judge.

During the trial of this matter certain evidence rulings were made. The following sets forth the bases of those rulings.

## THERE IS AMPLE INDEPENDENT EVIDENCE AS TO THE MEMBERSHIP OF EACH DEFENDANT IN THE CONSPIRACY CHARGED

■ The proper standard to be applied by the court in determining whether co-conspirator statements may be submitted to the jury is whether the Government has established the existence of the alleged conspiracy, the membership of each defendant with it by a "fair preponderance of the independent evidence," and that such statements were made during the conspiracy and in furtherance of it. *United States v. Trotter,* 529 F.2d 806, 811 (3rd Cir.1976). *See also United States v. DiPasquale,* 740 F.2d 1282 (3rd Cir.1984); *United States v. Gibbs,* 739 F.2d 838 (3rd Cir.1984) (en banc); *United States v. Ammar,* 714 F.2d 238, 247 (3rd Cir.1983); *United States v. Continental Group,* 603 F.2d 444, 457 (3rd Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980); *United States v. Trowery,* 542 F.2d 623 (3rd Cir. 1976), *cert. denied* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977).

■ This standard of proof with respect to each defendant has been met by the United States, both at the end of the Government's case and at the end of all the evidence.

*Rosario Gambino*

On January 17, 1984, the defendants, Rosario Gambino, Anthony Spatola and Giovanni Bosco, met at the Caffe Milano in Brooklyn, New York, and stayed there on and off until approximately 1 a.m. on January 18, 1984, for the purpose of obtaining heroin to sell to undercover agents at approximately 4 a.m. on January 18, 1984. (8 Tr. 1447–49, 9 Tr. 1609–12).[1]

1447 of the transcripts.

Approximately 13 minutes after Anthony Spatola's arrival at the Caffe Milano, a Mercedes Benz bearing New Jersey registration 228–VIF was observed leaving the curb in front of the Caffe Milano[2] (8 Tr. 1448).

In an intercepted conversation later that day, Anthony Spatola indicated that the heroin would arrive at the Caffe Milano between 11 and 11:30 p.m. (Exhibit 138b). At approximately 11:19 p.m. the Mercedes Benz was again observed at the Caffe Milano, and at 11:29 p.m., it was observed departing. (9 Tr. 1610–1611).

Although this vehicle is registered to Anna Zella, 512 Haddonfield Road, Cherry Hill, New Jersey, the address given for Zella is actually the address of a defunct night club, Valentino's. (10 Tr. 1853–54). The driver's license and insurance policy listed on the registration are false (Exhibit 6d 10 Tr. 1963). This automobile was observed at the residence of Rosario Gambino, and used by him frequently during the course of the investigation. (9 Tr. 1581–82, 10 Tr. 1855).

The defendants, Giovanni Bosco, Anthony Spatola and Antonio Gambino, rented Room 311 at the Caesar's Boardwalk Regency Hotel for the heroin sale of January 18, 1984. (Exhibit 8a). It was in this room that Special Agent Clagg tested and received the heroin purchased that day. (9 Tr. 1729). There was only one telephone call billed to this room during the time the defendants rented it. Approximately 20 minutes prior to the defendants' check out, a call was placed to the residence of Rosario Gambino. (Exhibit 8c). Upon leaving the hotel, Bosco, Spatola and Antonio Gambino drove directly to Rosario Gambino's residence in Cherry Hill, New Jersey. (8 Tr. 1343–46, 10 Tr. 1857). Prior to their arrival, at 9:30 p.m. the only vehicle parked in the Rosario Gambino residence was the above-described Mercedes Benz, N–J registration number 228–VIF. (10 Tr. 1852).

At the end of the Government's case, the jury could have inferred, and for 801(d)(2)(E) purposes I find, that this visit was made so that the three, Bosco, Spatola and Antonio Gambino, could report to Rosario Gambino on the success of their mission and to pay him part or all of the money received. On the defendants' case, Rosario Gambino and Anthony Spatola testified about this visit. Their explanation was that it was nothing more than a visit to wish Rosario Gambino well before he entered the hospital later that morning. Their testimony was undercut, however, by evidence consisting of English language transcripts of Sicilian language telephone conversations between Antonio Gambino and Erasmo Gambino's wife, and later, between Antonio Gambino and Rosario Gambino. Both calls, fairly read, readily yield the inference that Antonio Gambino was not aware of the fact that Rosario Gambino was going to be hospitalized; therefore, the defendants' version of the purpose of the visit by Bosco, Spatola and Antonio Gambino to Rosario Gambino's home was discredited.

On January 30, 1984, Special Agent Glass spoke to Antonio Gambino at approximately 4:20 p.m. Pursuant to ongoing heroin negotiations, Antonio Gambino advised Special Agent Glass that a half kilogram of heroin would be available for sale on the following day. They agreed to meet that evening at 9 p.m. to discuss the deal further. (4 Tr. 548).

At approximately 6:29 p.m. on that date the toll records for Rosario Gambino's residence telephone reflect a call to the Caffe Milano in Brooklyn (Exhibit 201). At approximately 7:25 p.m., Anthony Spatola called Rosario Gambino pursuant to Gambino's request. In that conversation, Rosario Gambino stated, "I called over there ... and there's a half (unintelligible) empty for tomorrow." He advised Spatola, "within this week," that there was a "white leaf"

---

**2.** Testimony was offered through a Carlo Filiberto that he borrowed the car from Rosario

Gambino. He was not a credible witness.

for tomorrow but that "if there should be," he would call Spatola. (Exhibit 160b).

Immediately after this telephone conversation, calls were intercepted from Anthony Spatola to co-conspirators Antonio Gambino and Giovanni Bosco. (Exhibits 161b, 162b). That evening when the undercover agents met with Antonio Gambino and Anthony Spatola, they were advised that despite Antonio Gambino's assurance at 4:20 p.m. that afternoon, the heroin would not be definitely available on Thursday. (4 Tr. 571). The information given to the agents at this time as to the availability of heroin was substantially a repetition of the information conveyed by Rosario Gambino to Anthony Spatola in Exhibit 160b.

On February 20, 1984, undercover agents purchased a second half kilogram of heroin from Antonio Gambino and Anthony Spatola for $120,000. (Exhibit 174b). Copies of the actual bills used to purchase this heroin were made and maintained. (5 Tr. 697). Following the sale, defendant Anthony Spatola telephoned Giovanni Bosco at the Spatola residence at approximately 7:35 p.m. (Exhibit 175b). At approximately 7:49 p.m., an incoming telephone call from Giovanni Bosco was intercepted over Rosario Gambino's telephone. In this call, Bosco was advised by Rosario Gambino's wife that Gambino had instructed her to tell Bosco that, as the Government argues, and I find, he could see Rosario Gambino at the Caffe Milano on the following day. (Exhibit 176b). Giovanni Bosco was observed on the following day at the Caffe Milano. (8 Tr. 1529–30).

On the date of his arrest, March 16, 1984, Rosario Gambino's residence was searched pursuant to a search warrant. Two of the $100 dollar bills used to purchase heroin on February 20, 1984, in this case were recovered.

### Erasmo Gambino

Immediately after Special Agent Glass telephoned Antonio Gambino on December 30, 1983, to inform him that he was authorized to negotiate the purchase of one kilogram of heroin, concentrated efforts were made by Anthony Spatola to reach Erasmo Gambino (Exhibits 105b–110b). In a call intercepted on January 2, 1984, Antonio Gambino asked to meet with Erasmo Gambino and there was the following exchange:

"ERASMO GAMBINO: Tell me something, is this to waste time or not?

ANTONIO GAMBINO: Not to waste time!

ERASMO GAMBINO: Not to waste time?

ANTONIO GAMBINO: No! We can marry this girl.

ERASMO GAMBINO: She can be married?

ANTONIO GAMBINO: Yes!

ERASMO GAMBINO: Did he like her?

ANTONIO GAMBINO: Yes. He like her but, we have to talk.

ERASMO GAMBINO: I understand.

ANTONIO GAMBINO: It can be done!

ERASMO GAMBINO: But she's tasty, she's never been out with anyone else.

ANTONIO GAMBINO: I know, but you know how it is, they always have something to say, like they say her mouth is too big. They always have something to say, you know women are?"

Later, in the same conversation, there was a reference to when "we" get married. (Exhibit 111b). In light of the subsequent use of the marriage code between Special Agent Glass and Antonio Gambino (Exhibit 115b), and the substance of Special Agent Glass' call on December 30, 1983 (Exhibit 140b), I find that Antonio Gambino was using the marriage code (Exhibit 111b) to inform Erasmo Gambino of the status of his heroin negotiations with Special Agent Glass. In this same conversation, a meeting was arranged for following day. On January 3, 1984, Erasmo Gambino was observed meeting with Anthony Spatola at the Playboy Casino Hotel in Atlantic City. During their meeting, Erasmo Gambino used a public telephone in the lobby, on one occasion placing a call to the Caffe Milano in Brooklyn (Exhibit 2, 8 Tr. 1332), the place later visited by Anthony Spatola to

obtain the heroin for the January 18, 1984 sale. (8 Tr. 1447–49, 9 Tr. 1609–12).

On January 13, 1984, Special Agent Glass telephoned Antonio Gambino to advise him that he would return to the Atlantic City area on Monday, January 16, 1984, with the money and everyone necessary for the heroin deal and that the deal could then take place on Tuesday, January 17, 1984 (Exhibit 115b). In this conversation, Antonio Gambino instructed Special Agent Glass in the use of a "new language" which employed codes. Specifically, he used phrases relating to buying a car and marrying a girl as codes for the sale of heroin. Immediately after this conversation, Antonio Gambino called Anthony Spatola and conveyed to him the information he had just received from Special Agent Glass by using the marriage code he had just instructed Special Agent Glass to use. (Exhibit 116b). Anthony Spatola, in turn, called Erasmo Gambino on the same day. Employing the same marriage code as had been used in Exhibits 115b and 116b, Erasmo Gambino and Anthony Spatola discussed Spatola's request to have "this marriage on Tuesday," including his need to "pickup the fiance" on Monday for his "appointment with a father-in-law on Tuesday." (Exhibit 117b). The relationship between Spatola's conversation with Erasmo Gambino in Exhibit 117b and the conversation between Antonio Gambino and Special Agent Glass in Exhibit 115 is obvious.

There was another significant series of telephone calls involving Erasmo Gambino during the course of the preparations for the heroin sale on January 18, 1984. On January 16, 1984, Special Agent Glass spurned Antonio Gambino's offer to do the deal that Thursday, (January 19, 1984) and insisted that the deal be concluded on Tuesday (Exhibit 118b). Immediately after this conversation, Antonio Gambino and Anthony Spatola had a conversation in which they discussed the fact that Special Agent Glass was unwilling to wait until Thursday. In this conversation, Antonio Gambino and Anthony Spatola also discussed necessary steps to take to be able to sell the heroin on the next day, which steps included getting

in touch with a certain individual. (Exhibit 119b). Thereafter on that day, Anthony Spatola called the Caffe Milano at 10:43 p.m. (Exhibit 124b) and at 11:51 p.m. (Exhibit 126b) and Erasmo Gambino's residence (Exhibit 125b) asking for "Erasmo." Shortly after midnight, Erasmo Gambino placed a collect call to Anthony Spatola in response to Spatola's efforts to contact him. Spatola told Erasmo Gambino, "I must see you! . . . and early!" When Gambino stated, "it's not like I have it in my pocket . . .," Spatola replied, "then everything is spoiled," adding, "listen to me, we have everything ready . . . everything!" Erasmo Gambino promised to call back in 20 minutes and Spatola implored him, "please, Erasmo, do me this favor?" (Exhibit 128b).

Immediately after this call, Spatola called Antonio Gambino, discussing this call and whether the "quail could be flown." (Exhibit 129b).

Erasmo Gambino called Spatola back as promised. He said that there was "no pizzaiolo for tomorrow," but assured Spatola, "they guaranteed some for around Wednesday or Thursday, for sure." Spatola objected that "the fiance was already here!" When asked for an "exact date," Erasmo Gambino replied, "Thursday." (Exhibit 130b). As was the case with the earlier call, Spatola immediately called Antonio Gambino after this call and discussed the proposed sale of heroin to Special Agent Gambino, making reference to the fact that Special Agent Glass was to call Antonio Gambino at 10:30 a.m. (Exhibit 131b).

When Special Agent Glass called Antonio Gambino the next morning at approximately 10:37 a.m., Antonio Gambino told him that the "champagne" would be ready Thursday (Exhibit 132b), the "exact date" provided by Erasmo Gambino in Exhibit 130b.

The first meeting between Special Agent Glass and Antonio Gambino after the January 18, 1984, heroin sale was on January 20, 1984. At this meeting, Antonio Gambi-

no told Special Agent Glass that there were three kilograms of heroin available. Special Agent Glass replied that he would have to get back to Antonio Gambino at the beginning of the next week after speaking to his boss and learning whether he was satisfied with the quality of the heroin just purchased. (3 Tr. 384, 392). On the same day, Antonio Gambino had a telephone conversation with Erasmo Gambino in which Antonio Gambino stated, "I spoke with him today .... And he told me, it's because he has to speak to that guy—the other guy, no? ... and he stated that by Tuesday he'll have an answer for me." Antonio Gambino then asked to call Erasmo Gambino from an "outside phone" so that he could speak more freely. (Exhibit 145b). Anthony Spatola and Antonio Gambino had yet another conversation with Erasmo Gambino on Sunday, January 22, 1984, in which Antonio Gambino stated that he would have an answer on Tuesday, that "on Tuesday he's going to tell me precisely when and how we're going to marry these youngsters." (Exhibit 148b).

On January 24, 1984, Special Agent Glass met with Antonio Gambino and Anthony Spatola as planned. This meeting was followed by a call from Spatola to Erasmo Gambino later in the day. (Exhibit 150b).

On January 26, 1984, there were highly publicized heroin arrests in Philadelphia which Special Agent Glass called to the attention of Antonio Gambino and Anthony Spatola on January 27, 1984. (Exhibit 13, 3 Tr. 496). Thereafter, the course of negotiations was altered. The most dramatic development arose in the meeting of February 2, 1984 at Caesar's Boardwalk Regency. In a meeting on January 30, 1984, the undercover agents had been told that heroin would be available for sale on Thursday, February 2, 1984. At this meeting, however, the undercover agents were advised that the people providing the heroin were very concerned by the arrests in Philadelphia and were now very cautious. (4 Tr. 577). Prior to this meeting Anthony Spatola and Giovanni Bosco were observed with Erasmo Gambino at the Caffe Milano in Brooklyn. (Exhibit 504, 11 Tr. 2058–59).

Thereafter, Antonio Gambino advised Special Agent Glass that there would be no more heroin sales until he and Anthony Spatola visited Special Agent Short in California to learn more about him. (4 Tr. 583). On February 14, 1984, Special Agent Glass agreed to this trip but asked that Giovanni Bosco come along. (4 Tr. 587). On February 16, 1984, Antonio Gambino called Special Agent Glass and told him that Giovanni Bosco would be accompanying them to California. (4 Tr. 599). On February 17, 1984, Anthony Spatola and Antonio Gambino were observed going to Philadelphia to meet with Erasmo Gambino. (8 Tr. 1434–35). That evening, Antonio Gambino telephoned Special Agent Glass to inform him that heroin was available for a sale prior to the California trip. (4 Tr. 610). On February 20, 1984, Special Agent Glass and Special Agent Clagg purchased an additional half kilogram of heroin from Anthony Spatola and Antonio Gambino (Exhibit 174b).

*Anthony Spatola*

Immediately after Special Agent Glass called Antonio Gambino at Figero's Pizzeria Number 2 on December 30, 1983, to advise him that he was authorized to negotiate the purchase of one kilogram of heroin, it was Anthony Spatola who made the persistent calls to reach Erasmo Gambino (Exhibits 105b–110b). When a meeting with Erasmo Gambino was arranged to discuss the planned "marriage," it was Anthony Spatola who met with Erasmo Gambino at the Playboy Hotel on January 3, 1984. (8 Tr. 1331–38, 1425).

On the following evening, Spatola was introduced to Special Agent Glass as "John, the boss from out of state," in a meeting exclusively devoted to discussing how the proposed heroin sale would take place. It was required that Special Agent Glass wear a bathing suit and meet with Spatola in the whirlpool so that Spatola and Antonio Gambino could be assured that he was not recording the meeting. (2 Tr. 164).

Thereafter, Spatola was involved in a number of conversations relating to the heroin transactions with Special Agent Glass and with his co-conspirators (Exhibits 114b, 116b–119b, 121b–131b, 133b–138b, 142b, 144b, 146b–147b, 159b–162b, 164b–166b, 168b, 169b, 171b–175b). These conversations and the observations of surveillance agents reveal that Anthony Spatola made numerous efforts to contact Rosario Gambino and Erasmo Gambino to either obtain approval for pending negotiations or to obtain heroin for the sales to the undercover agents and that he further drove the heroin from the Caffe Milano to Caesar's Boardwalk Regency Hotel for the sale on January 18, 1984. (8 Tr. 1447–49, 9 Tr. 1609–12). Along with Antonio Gambino, he was present for the actual heroin sales on January 18, 1984 (Exhibit 143b) and on February 20, 1984, (Exhibit 174b).

Spatola testified. He admitted his involvement.

### Antonio Gambino

Antonio Gambino was introduced to Special Agent Glass on October 23, 1983 by a person named "Hank." On that date, Antonio Gambino confirmed the fact that he had access to heroin and indicated that he would see if he could obtain some for Special Agent Glass. (Exhibit 100b). Following this meeting, Antonio Gambino met with Special Agent Glass on a number of occasions for the purpose of selling him cocaine and continuing discussions about the possibility of selling Special Agent Glass heroin. During these meetings, Gambino repeatedly referred to "his people" who would be supplying the heroin to him. (7 Tr. 1100–1104). On December 27, 1983, Antonio Gambino delivered a sample of heroin to Special Agent Glass. (Exhibits 103b, 1 Tr. 102). Thereafter, he engaged in numerous conversations relating to the heroin transactions with Special Agent Glass and with others (Exhibits 104b, 111b–116b, 119b–121b, 127b, 129b, 131b–142b, 144b, 145b, 147b–150b, 153b, 157b, 159b, 161b, 163b, 169b, 178b, 179b), and delivered approximately one half kilogram of heroin to the undercover agents on January 18, 1984,

(Exhibit 143b) and on February 20, 1984 (Exhibit 174b). His entrapment claim was unworthy of belief.

### Mario Gambino

Antonio Gambino was introduced to Special Agent Glass on October 23, 1983 by a person known as "Hank." In that conversation, (Exhibit 100a and b), Gambino confirmed that he had access to heroin from a source other than his source for cocaine but that such purchases would have to be for substantial quantities. He referred to the danger associated with heroin and asked Hank if he guaranteed Special Agent Glass with his life. He agreed to make further sales of cocaine to Special Agent Glass but stated that he had to proceed carefully as to heroin negotiations, observing that for all he knew, Special Agent Glass could be an FBI agent. (Exhibit 100a and b).

On November 9, 1983, Special Agent Glass and Antonio Gambino met at a McDonald's restaurant in Ocean City, New Jersey, for a sale of cocaine. Prior to this meeting Antonio Gambino had indicated to Special Agent Glass in a telephone conversation that he wanted to discuss something else with him but did not wish to discuss it on the telephone. (6 Tr. 1038). At the meeting Antonio Gambino discussed possible heroin sales with Special Agent Glass. While the meeting was taking place, Mario Gambino was observed sitting in the restaurant conducting countersurveillance. (8 Tr. 1321).

After Special Agent Glass telephoned Antonio Gambino on December 30, 1983, to advise him that the sample of heroin provided was satisfactory and that he had authorization to negotiate to purchase one kilogram of heroin, a number of attempts were made to contact Erasmo Gambino. (Exhibits 104b–110b). In a conversation intercepted on January 2, 1984, (Exhibit 111b), Anthony Spatola and Antonio Gambino had a conversation with Erasmo Gambino in which Antonio Gambino advised Erasmo Gambino that "we can marry this girl." A meeting was arranged for the following evening (Exhibit 111b).

At approximately 6:30 p.m. on January 3, 1984, while Spatola was at the Playboy Hotel waiting to meet Erasmo Gambino, a telephone call was intercepted from Mario Gambino to Antonio Gambino. (Exhibit 112b). Antonio Gambino complained of being cut out of the meeting between Erasmo Gambino and Anthony Spatola and voiced concern at possibly being cut out of the heroin deal itself. Mario Gambino demonstrated his knowledge of the ongoing negotiations in this conversation, offering advice to Antonio Gambino on how to proceed and instructing him to tell his source of supply that he, Mario Gambino, vouched for the buyer so that Antonio Gambino could win approval for his proposed sale to the undercover agent. In this conversation there is also a reference to the countersurveillance conducted by Mario Gambino on November 9, 1983.

Later that evening, Antonio Gambino reported the results of the meeting between Erasmo Gambino and Spatola to Mario Gambino. (Exhibit 113b). Antonio Gambino advised his brother that he had asked for permission to "let ... Mario in [because] he's already been involved" and was told "for the money, okay, but not to go inside." Mario and Antonio Gambino then had an extensive discussion about the heroin negotiations in which Mario Gambino repeatedly advised Antonio Gambino on how to handle the negotiations and cautioned him not "to be in the motel when the deal goes down."

On the evening of January 17, 1984, there were a series of three telephone calls intercepted between Antonio Gambino and Mario Gambino. (Exhibits 139b–141b). The second call at 9:05 p.m. is actually a continuation of the first call at 9:02 p.m. which ended abruptly with Mario Gambino hanging up while Antonio Gambino was talking. In Exhibit 140b, Antonio Gambino informs his brother, "maybe tonight we have to do that job, the one we've talked about." When Mario Gambino indicated that he didn't understand, Antonio Gambino stated, "that one, Mario. The one I talked to you about ... that guy we know ... the guy we once met together." Anto-

nio Gambino's explanation is an apparent reference to the fact that Mario Gambino conducted countersurveillance of his meeting with Special Agent Glass on November 9, 1983. Mario Gambino's immediate reply to his brothers statement was to ask "around what time?" And, when told, he answered "okay, we can do it in the morning." He was then advised by Antonio Gambino that he would play no active role in the transaction that evening. In Exhibits 140b and 141b Antonio Gambino and Mario Gambino refer to certain items concealed at Mario Gambino's residence. Aside from gold, there are vague allusions to other items which Antonio Gambino apparently needed in preparation for the pending heroin deal. Among the vague references are mentioned "bullets," and "the one with the projectiles," apparently coded references to firearms and/or ammunition.

Surveillance agents observed Anthony Spatola and Antonio Gambino go to Mario Gambino's residence for brief periods of time on January 17, 1984, prior to Anthony Spatola leaving for New York to obtain the heroin and again on February 20, 1984, prior to the heroin sale. (8 Tr. 1342, 1349–51).

On February 20, 1984, Antonio Gambino and Anthony Spatola sold a second half kilogram of heroin to the undercover agents in this case. That evening following the heroin sale, Antonio Gambino called Mario Gambino, who immediately warned his brother that there were problems; that the telephone at the pizzeria had been tapped. Antonio Gambino told his brother that as a result of a dispute Mario Gambino had had with Anthony Spatola, Antonio Gambino was now unable to argue in his behalf with respect to the money they now had to divide. He also referred to a prior payment of $1000 "they" had given to Mario Gambino. (Exhibit 178b). Approximately one half hour later, Antonio Gambino called Mario Gambino again and told him that he would be giving him $300 and that there would be another $300 for a total of $600 as Mario Gambino's "gift."

There was a further discussion of the telephones being tapped. (Exhibit 179b).

As I have earlier noted, the defendants Rosario Gambino and Anthony Spatola testified. It was the impression of this court that Rosario Gambino in part, was not a credible witness. His effort to explain away the early morning visit by Bosco, Spatola and Antonio Gambino to which reference has already been made was undermined by the previously referenced evidence of telephone calls placed by Antonio Gambino to the home of Erasmo Gambino and thereafter to Rosario Gambino in the hospital. He also failed to adequately explain the presence of the two $100 dollar bills which matched bills which had been used by the Government agents to purchase the heroin. His credibility was further undermined by evidence showing the tremendous value placed by him on his personal property after he, in his testimony, had discussed it in terms of furniture 15 years old and "garden furniture." Thus, the case against him for the purposes of this analysis was, if anything, stronger after he testified than it had been before.

As to Anthony Spatola, his credibility was placed in doubt by his claim that he had been "pressured" by Government agents to join in the heroin transaction. That Spatola readily and rapidly took advantage of the opportunity offered by the agents was apparent. Almost at once, he was playing a key role in obtaining the heroin, to the extent that he quickly subordinated Antonio Gambino's role to his. In making my determination of his credibility under F.R.E. 104(a), I decided from my observations of him on the one hand, and Agent Glass on the other, that Spatola was not telling the truth when he said that Glass had twice visited him at Figero's II to persuade him to participate in the heroin transaction. Again, for the purposes of this analysis, the case against Spatola was, if anything, stronger at the end of the defendants' case than it had been earlier.

I have already commented on the witness Filiberto, called by Rosario Gambino to testify that he, Filiberto, had on a critical day to this case, borrowed Rosario Gambino's automobile to drive it to Brooklyn to buy supplies for his pizzeria. On its face the contention is ludicrous. The pizzeria is located in Philadelphia. Yet Filiberto would have us believe that he had to go to Brooklyn to buy supplies because none were available in Philadelphia. Discrediting the reason for the trip to Brooklyn is to discredit the testimony.

Also called by the defendant Rosario Gambino was Agent Lynch. Lynch was called in an effort to explain away the presence of the two $100 dollar bills in Rosario Gambino's bedroom, which tied him to the receipt of money earlier paid by federal agents to Spatola and Antonio Gambino for the heroin. This effort failed.

In conclusion, I find that the Government proved by a preponderance of the evidence the conspiracy charged; by independent evidence, membership therein of each of the defendants; and that the statements alleged to be hearsay were in furtherance of the conspiracy and were made by members of the conspiracy at a time when the defendants against whom they were offered were members of the conspiracy. This was so both at the end of the Government's case and at the end of all of the evidence.

## THE ALLEGED INCOMPETENCE OF ROSARIO GAMBINO AND ANTONIO GAMBINO

Prior to trial, many days were spent on 18 U.S.C. Section 4244 hearings, brought on by claims of Rosario Gambino and Antonio Gambino that they could not prepare a defense by reason of psychiatric disability. Putting aside the bizarre coincidence of two of five defendants making this contention, I dealt with each on its merits and heard extensive medical testimony.

Opinions were then filed denying motions made by each defendant for his severance and postponement of their trial.

As to Antonio Gambino, the record reflects that, after initially giving his then

counsel reason to believe that a defense could not be prepared, this defendant, shortly before trial, dropped this attorney (a Federal Public Defender appointed under the Criminal Justice Act) and retained private counsel. It is clear that new counsel satisfied himself that Antonio Gambino was able to make the decision to drop earlier counsel and retain present counsel. It is also clear that present counsel had no difficulty in preparing a defense of entrapment and presenting it at trial. Moreover, the court saw no indication during trial that this defendant was suffering from any mental disability that prevented him from understanding what was taking place.

As to Rosario Gambino there is more to be said.

After extensive pre-trial testimony, I ultimately determined that this defendant was malingering; and that the symptoms he claimed to be suffering from, and manifesting, were "faked" in order to avoid trial. This conclusion was not easily reached, given the expert testimony the defendant was able to summon to support his claim. Thus he had two psychiatrists, Drs. Berger and Portnow from Bellevue, who testified for him, both of whom had eminent credentials. Yet it was clear to me that the physicians and psychologist called by the United States were telling the truth when they testified that this defendant was attempting a deception—to avoid trial—and that Drs. Berger and Portnow had been deceived.

A six week trial has now been concluded. The difference in this defendant's appearance, manner and bearing throughout the trial, as contrasted with the way he appeared in court during the Section 4244 hearing, has been marked. Because of the earlier proceeding, I have closely observed this defendant through the trial. He has been alert, not slumping, and in frequent whispered conversation with his counsel, and, indeed, with counsel for another defendant, Erasmo Gambino.

The representation made to me before trial that this defendant would not confer with counsel obviously was not accurate once the trial started. Events during the Government's case, requiring, on cross-examination of Government witnesses by this defendant's counsel, that he have information from his client to put the questions, were enlightening. Questions asked on cross-examination in such situations by said counsel in many instances reflected knowledge that could only have come from his client.

Any remaining doubts about this defendant's mental capacity would have been removed, however, by his testimony at trial.[3]

He was not the stumbling, retarded, mentally deficient, psychotic Drs. Berger and Portnow described; he was intelligent, bright, alert and sensitive to difficult areas in his case. One wishes that these physicians had been present in court on October 11 and 12, 1984, when this defendant responded quickly and readily to questions on direct examination; and present when, even more significantly, he easily handled questions on cross-examination and then, on redirect examination, when his attorney dealt with points and matters raised on cross-examination given certain evidence in the case that, based upon his cross-examination, he felt he had to answer and explain. It was a masterful performance, one I think that would have astonished Drs. Portnow and Berger.

It is certain that, had I decided the Section 4244 matter as urged by Drs. Portnow and Berger, it would have been a miscarriage of justice. So that there is no doubt: I do not charge that Drs. Portnow and Berger lied in the testimony they presented before me. What is clear, however, is that they were misled and deceived by the defendant. This raises disquieting concerns about the utility, accuracy and reliability of psychiatric testimony, not only as to Drs. Berger and Portnow here, but generally.

---

**3.** That the defendant (and his counsel) elected to have defendant testify is persuasive evidence that everything Drs. Berger and Portnow had testified to was totally wrong.

## DEFENDANTS' MOTION
## FOR MISTRIAL

■ During the rebuttal summation of the Assistant United States Attorney she described Spatola's role in this trial as one that was designed to "cut all the defendants loose" except for Antonio Gambino. Referring not only to Spatola's testimony, but also to argument of his attorney, she then said the following:

MISS MURPHY: "... you saw also during the course of this case how the defendants used codes in their conversations. How they were careful about using the telephone. And would avoid the use of the telephone in certain instances.

"But now they stand before you and they were caught by the police.

"You heard Anthony Spatola give you testimony which, if believed, would cut each of the defendants loose in this courtroom who was not on videotape.

"You heard his attorney give arguments to you, sometimes he directed you to the evidence, sometimes he did not. However, his arguments, if accepted, would also show that Rosario Gambino and Erasmo Gambino are not guilty. In fact, you heard Rosario Gambino's attorney and Erasmo Gambino's attorney thank him for his services. And you may consider that in presenting this testimony to you, these defendants have continued their conspiracy and—"

MR. FISCHETTI: "Objection."

MR. EVSEROFF: "Objection."

MR. FISCHETTI: "Side bar."

THE COURT: "Objection—objection sustained...."

The record thus reflects she was interrupted at this point by what occurred almost simultaneously: objections by counsel for the defendants Erasmo Gambino and Rosario Gambino and this court's sharp reprimand. Additionally, the court at once addressed the jury as follows:

THE COURT: "Objection—objection sustained.

"Ladies and gentlemen, you're instructed to disregard that, that statement by counsel was entirely improper. It was out of order and I'm reprimanding her right now."

Immediately thereafter, the court then polled each juror to determine whether the jury could follow the instruction that had just been given. Each juror answered in the affirmative.

Notwithstanding the corrective action so promptly taken by the court, all defense counsel moved for a mistrial. After taking the matter under advisement over the luncheon recess, the court denied the motion: the court's offer to give additional curative instruction was considered by counsel for the defendants but rejected.

The statement by the Government is explained (although not justified) by the following circumstances. Based on its own experience, the court could not help but observe that the defendants had closely co-operated in presenting their case. The "musical chairs" retention of counsel by itself is suggestive of this. This court has never had a situation where during the course of pre-trial so many counsel have been in and out of a case. The high degree of co-operation between counsel for Rosario Gambino, Erasmo Gambino, Antonio Gambino and Mario Gambino, all from New York City, was marked. That counsel for Spatola was also co-operating closely with the other attorneys was also clear from this court's observations during the six week trial. That each attorney knew what the other attorney was going to cover on summation was apparent. By way of example, at one point counsel for Spatola in his summation said that he was not going to deal with a certain matter "because Mr. Evseroff will." Mr. Evseroff represented Rosario Gambino and summed up after counsel for Spatola.

Most significantly, Spatola during his testimony, in addition to presenting the bases for his entrapment claim, attempted to do what the Government charged, that is, "cut loose" all of the other defendants in the case (except for Antonio Gambino,

who of course was on videotape and involved in numerous taped telephone conversations). Legitimate inferences could readily be drawn from Spatola's efforts to explain the meaning of words in conversations between him and others, including Rosario Gambino and Erasmo Gambino, that Spatola was lying in order to save those defendants.

Turning again to the summation of Spatola's counsel, obviously sensitive to the suggestion by the Assistant United States Attorney on her opening summation argument that Spatola's role was to exculpate the other defendants, he explained to the jury that the reason that Spatola in his testimony and he in argument were endeavoring to exculpate Rosario Gambino and Erasmo Gambino was that Spatola was charged with being in a conspiracy with them. Presumably by this he meant that, in arguing that they were not involved, his client, Spatola, would thereby be exculpated. Yet Spatola had nothing to gain for himself on the conspiracy charge by exculpating Rosario Gambino and Erasmo Gambino. Whether they were found guilty or not made absolutely no difference insofar as the conspiracy charge against Spatola is concerned. This is because Spatola, by his entrapment claim, had admitted that he had participated willfully and knowingly in the conspiracy charged; his defense was that he had been entrapped into doing so. Obviously, therefore, Spatola and his attorney can be likened to the "officious volunteer" in dealing with the subject of the guilt or innocence of Rosario Gambino and Erasmo Gambino on the conspiracy charge.

Nor is it without significance that counsel for the other defendant who pleaded entrapment, Antonio Gambino, spent no more than an hour in his summation. Spatola's counsel, on the other hand, argued for between 4–5 hours, almost as much as the total time taken by all of the defense counsel together.

Indeed, what he was attempting to achieve was so clear to all in the courtroom that counsel for Erasmo Gambino, when he arose to address the jury in his summation, made the observation that:

MR. FISCHETTI: "Thank you, Judge Lacey.

"Thank you, Mr. Galluccio.

"He gave my whole summation. I felt like an understudy sitting there waiting for somebody to get off to give me a chance to go on. He covered all the material—most of it, that concerns my client, Erasmo Gambino...."

This same declaration was made by counsel for Rosario Gambino when he commenced his summation.

The foregoing should not be construed as a denunciation by this court of the trial strategy pursued by the defendants and their counsel. It was a strategy that was well-conceived and brilliantly executed. Defense counsel, all seasoned in the criminal defense field, thus surprised Government counsel in the way the defense of all of the defendants was contoured and presented. They should not be condemned for this. Instead, their ability should be recognized for what it was, representation of the highest order.

There can be little doubt that the jury understood what was happening. The jury knew what the court has already noted: that Spatola's effort to "cut loose" Rosario Gambino and Erasmo Gambino was not related at all to the fact that they along with him were charged in the conspiracy count. The jury had to know that even if they were freed, Spatola's position as an alleged member of the conspiracy charged in Count 2 was not improved thereby: given the evidence as presented by Spatola himself, the conspiracy charged still existed, with Spatola an admitted member of it; only the co-conspirators changed, if the jury believed his testimony.

Notwithstanding the foregoing, the Government's comment should not have been made. As I stated during the trial, however, the comment consisted of no more than a half dozen words which were buried under counsel's objections and the court's immediate instruction and polling of

658

the jury and reprimand of Government counsel. The sense that this court has of the entire situation is that the Government's cause suffered seriously from the incident. Sensitive as this court was to the ambiance of the courtroom at that moment, there was no injury to the defendants' cause. Accordingly, the motion for mistrial was denied.

## RULE 23(b) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

Fed.R.Cr.P. 23(b) provides as follows:

■ "Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more juror for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors."

The jurors retired to deliberate at 4 p.m. on October 19, 1984. They deliberated until 6 p.m. on October 19 and were thereafter sequestered until they reached a verdict.

On October 20, their deliberations began at 9 a.m. and concluded at 10 p.m. On October 21 deliberations commenced at 10:15 a.m. and continued throughout the day, until the following occurred at approximately 8 p.m.

At 8 p.m. the jurors, through their foreman, transmitted to the court a note stating that enclosures transmitted, consisting of three sheets of paper, had been discovered in the exhibit box, although not marked into evidence. These documents were immediately marked by the court as Court Exhibits, CE–22(a), (b), and (c).

The matter was immediately taken up in open court with counsel and in the presence of all of the defendants. The documents were identified by Assistant U.S. Attorney Murphy as hers and as setting forth notes she had made about the case sometime prior to trial. Immediate inquiry of the jury, conducted in the presence of counsel and the defendants, leads this court to find that these documents had been inadvertently deposited in the bottom of the box in which all of the exhibits had also been placed before being carried to the jury room, first on October 20 and again on October 21. While the United States obviously is at fault for not having exercised care to keep these notes out of the box in question, defense counsel cannot escape blame for this incident. At least twice the court directed that all counsel, not only counsel for the United States, but also counsel for the defendants, review all of the exhibits before they were sent to the jury. Such a review obviously called for inspection not only of the exhibits themselves but also the box which contained them. Somehow these notes went undetected. Thus I must expressly find that the negligence of all counsel contributed to this occurrence.

At the suggestion of defense counsel, the court had brought the jury into the courtroom. Questions quickly elicited the fact that only two jurors had seen any of the three documents involved. One, Mrs. Susan Peach, Juror Number 4, had seen only Court Exhibit 22(a). This exhibit is innocuous. It does little more than list and briefly describe the counts of the indictment. She had no discussion with any of the other jurors about the contents of this document. On the other hand, Mr. Ojdana saw Court Exhibit 22(b), although he did not discuss it with any jurors. This exhibit contains notes referring to the defendant Mario Gambino. While I do not attach the importance to this exhibit that is given it by counsel for this defendant, it is more significant than Court Exhibits 22(a) and (c) (neither saw 22(c)).

At the request of defense counsel, Mr. Ojdana was questioned at side bar out of earshot of the other jurors. He indicated that he perceived the specific reference to Mario Gambino as having to do with another defendant, Antonio Gambino. On this

basis, the attorney for Mario Gambino contended that this juror had made a connection between the exhibit in question and the trial testimony which in turn implanted a fixed conclusion in the mind of this juror that substantially prejudiced his client. At the conclusion of the hearing, at approximately 9 p.m. on October 21, all defense counsel joined in a motion to remove Mr. Ojdana and substitute for him the first alternate. I took the matter under advisement.

The court was impressed with the fact that Mr. Ojdana had not discussed the contents of Court Exhibit 22(b) with any other jurors and that Mr. Ojdana was able to assure the court that he would follow its instructions that this document had absolutely nothing to do with the case and was to be disregarded. Nonetheless, the court understood the concerns of defense counsel, particularly counsel for Mario Gambino.

Addressing the matter of remedy, it was clear that all defense counsel felt that, as one of them put it during the hearing, not only justice but the "appearance of justice" was important here and that, accordingly, Mr. Ojdana should be removed. After considering the matter carefully over the evening, and after hearing further argument from defense counsel the next morning, October 22, the court decided to grant the application made by all defense counsel to the extent they asked for the removal of Mr. Ojdana, doing so only after advising counsel that, were I to grant their application as to removal, I was not going to grant the second part of their application, namely, "plug-in" an alternate, but rather would utilize Fed.R.Cr.P. 23(b) and proceed with 11 jurors. While objecting to the latter procedure, and without waiving their right to have an alternate substituted, the defendants continued to move for removal of Ojdana, contending he was "tainted."

Finding "just cause," I excused Mr. Ojdana, appropriately instructed the jury as requested by counsel, and thereafter, later that day, a verdict was rendered by the jury of 11 persons.

There can be no issue over whether there was "just cause," under Rule 23(b). Indeed, given the incident, and the insistence of all defense counsel that Mr. Ojdana, by reading Court Exhibit 22(b), had been tainted, and given the Court's view that the position of the defendants was not without merit, the court could not have done otherwise than excuse the juror. It is impossible to conceive of a clearer case of "just cause."

While explicitly contending that just cause required the juror's removal, the defendants argued that the court should follow cases such as *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981) and substitute an alternate for the excused juror.[4] It is necessary to place this argument in context.

At the time that the jury retired to consider its verdict, the court decided not to discharge all alternates. See Fed.R.Cr.P. 24(c). Throughout the period of deliberations two alternates were kept in sequestration, while being isolated from the jury. This was done notwithstanding the fact that defense counsel questioned the procedure. The court indicated that it was holding the two alternates to guard against any problems that might arise during deliberations, at the same time advising counsel that the court would not take silence of counsel as consenting to the procedure. As the court noted at the time, it would entertain further argument should an emergency arise that required consideration of what was to be done to avoid a mistrial should a juror be excused during the course of deliberations.

When the need for further consideration of the issue of substitution of an alternate arose, defense counsel, in contending that an alternate should be substituted, noted that the court had not discharged two alternates but had kept them. From this presumably counsel were contending that the court had somehow estopped itself from

**4.** The Court of Appeals for this Circuit has not decided the issue.

following some other course other than substitution of an alternate.

This judge has been and is presently a member of the Supreme Court Advisory Committee on the Federal Rules of Criminal Procedure. In 1982 the Advisory Committee proposed an amendment to Fed.R. Cr.P. 23(b).[5] As amended, effective August 1, 1983, this rule reads as follows: "Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more juror for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors."

The underscored portion was what was added by amendment. The amendment addresses the specific problem of how to deal with the situation involving the necessity of excusing a juror after deliberations of the jury have been underway. Cases such as *United States v. Phillips, supra,* had projected the matter to the attention of the Advisory Committee. Thereafter, the Advisory Committee had submitted to the bench and bar alternate courses for dealing with the *Phillips,* situation. One course was to amend Rule 24 so that, as in *Phillips,* alternates could be substituted for jurors who, during deliberations, were no longer able to serve. The other procedure that was advanced was permitting the judge to excuse a juror and proceed with 11 jurors.

The response of the bench and bar to these proposals resulted in the Advisory Committee adopting the second of these two procedures, resulting in the amendment to Rule 23(b).

The court is frank to say that had it been confronted with the necessity of excusing two jurors, it would have seriously considered substituting the two alternates. This is because the amendment to Rule 23(b) does not allow the court, on its own motion, to go below 11 jurors, always assuming of course that "just cause" exists for excusing one juror. Fortunately, however, the hearing that was immediately conducted demonstrated that only one juror had been exposed to Court Exhibit 22(b), and thus only he had to be excused.

Counsel for the defendants contended that, given the line of cases represented by *Phillips* and their unanimous agreement on substituting an alternate, the court had to follow that course. What counsel overlooked was the fact that the very reason for the 1983 amendment to Rule 23(b) was to deal with the *Phillips* situation. Indeed, the trial judge in *Phillips* had to adopt a procedure in violation of Rule 24(c) because there was no provision at that time in Rule 23(b) to permit him to proceed with a jury of 11.

Moreover, as is set forth in the extensive Advisory Committee note, there are several profound difficulties in substituting an alternate after a jury has been deliberating for many hours, here well over 20 hours. Since they are set forth in the notes, I will not repeat them here.

While recognizing that had the court been required to excuse two jurors and thus substitute two alternates, or at least one, it would have had to confront the problems referred to in the Advisory Committee note, there can be no question but that Rule 23(b) is the better solution where only one juror has to be excused; indeed, it is the only procedure now permitted by the rules, after consideration had been given by the Advisory Committee to the *Phillips* line of cases.

Only two more points need be addressed. First, the decision to proceed with 11 jurors rather than declare a mistrial cannot be

**5.** This proposal was approved by the Standing Committee on Rules of Practice and Procedure of the Judicial Conference and the Supreme Court and, after Congress' inaction, became effective under 18 U.S.C. Section 3771.

questioned. The trial itself consumed 6 weeks; the jury deliberations had already lasted over 20 hours. Given this investment of judicial resources, a declaration of a mistrial would have been unthinkable in view of the alternative furnished by Rule 23(b). Moreover, all defense counsel, with one possible exception, stated that they did not want a mistrial. The defendant most directly affected, Mario Gambino, was vehement in his objection that a mistrial not be declared. Indeed, his counsel stated that his client had told him that he did not want to go through another trial. Parenthetically, it is noted that the jury ultimately acquitted this defendant. In any event, having found "just cause" as hereinabove discussed, the court exercised its discretion to proceed under Rule 23(b).

Finally, counsel for the defendants, in urging that this court proceed to substitute an alternate, did not attack Rule 23(b). Thus, the record is barren of any argument by defense counsel that somehow Rule 23(b) was flawed or faulted. Certainly, it cannot now be contended that there is any imperfection, constitutional or otherwise, in the procedure permitted under Rule 23(b).

For the foregoing reasons, the application made by the defendants for substitution of an alternate, rather than proceedings under Rule 23(b), was denied.