UNITED STATES of America

v.

GAMBINO, Rosario, Erasmo Gambino, Antonio Gambino, and Anthony Spatola, Appellants.

Nos. 84–5842, 84–5843, 84–5866, 84–5880 and 85–5396.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1986.

Decided April 18, 1986.

As Amended April 23, 1986.

Pamela W. Higgins, Higgins & Madden, Philadelphia, Pa., Herald Price Fahringer, (Argued), Lipsitz, Green, Fahringer, Roll, Schull & James, New York City, for Rosario Gambino.

Edna Ball Axelrod, (Argued), Asst. U.S. Atty., U.S. Atty's. Office, Newark, N.J., for appellee.

Ronald P. Fischetti, (Argued), Fischetti, Feigus & Pomerantz, New York City, for Erasmo Gambino.

Neil G. Duffy, III, Carey, Sayers & Duffy, Millburn, N.J., for Anthony Spatola.

Ira J. Friedman, (Argued), Gary A. Zucker, Brooklyn, N.Y., for Antonio Gambino.

Before: WEIS, HIGGINBOTHAM and BECKER, Circuit Judges

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Appellants [1] Rosario Gambino, Erasmo Gambino, Antonio Gambino and Anthony Spatola were indicted by a federal grand jury on multiple counts of narcotics related offenses. They were convicted *inter alia* of conspiring to distribute heroin in violation of 21 U.S.C. § 846. Appellants now appeal from their judgments of conviction. Alternatively, appellants urge that their sentences be vacated and their cases remanded for resentencing. For the reasons set forth below, we will affirm the district court.

### I.

Pursuant to a multi-count indictment, appellants Rosario Gambino, Erasmo Gambino, Antonio Gambino, and Anthony Spatola were convicted of conspiracy to distribute heroin in violation of 21 U.S.C. § 846. Indicted along with appellants on the conspiracy charge and related offenses were Mario Gambino and Giovanni Bosco. At the conclusion of the trial, Mario Gambino was acquitted on all counts with which he was charged. Bosco remained a fugitive throughout the trial. Rosario Gambino, Erasmo Gambino, and Anthony Spatola were convicted on two counts of possession of heroin and two counts of distribution of heroin in contravention of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Antonio Gambino was convicted on three counts of those offenses. The remaining counts contained charges of using the telephone to facilitate a conspiracy to distribute heroin in violation of 21 U.S.C. §§ 843(b) and (c). Rosario Gambino was convicted on one count of this offense; Erasmo Gambino, on two counts; Antonio Gambino, on three counts; and Anthony Spatola, on six counts.

1. Because three of the appellants bear the same surname, Gambino, for purposes of clarity they will be referred to by either their full names or their first names.

Subsequent to the jury verdict, the district court imposed the following sentences on the defendants:

Rosario Gambino—three consecutive fifteen-year prisons terms; one concurrent four-year term; terms of Special Parole, and total fines of $105,000.

Erasmo Gambino—two consecutive fifteen-year prison terms; one concurrent fifteen-year prison term; two concurrent four-year terms; terms of Special Parole, and total fines of $95,000.

Antonio Gambino—two consecutive fifteen-year prison terms; two concurrent fifteen-year prison terms; three four-year prison terms concurrent with each other and consecutive to the fifteen-year prison terms; terms of Special Parole, and total fines of $50,000.

Anthony Spatola—two consecutive fifteen-year prison terms; one concurrent fifteen-year prison term; six four-year prison terms concurrent with each other and consecutive with the fifteen-year prison terms; Special Parole, and total fines of $50,000.

Three primary questions are presented on this appeal from the district court's entry of judgments of conviction against the appellants for conspiracy to distribute heroin and against each of them individually for various related substantive offenses: (1) whether the evidence adduced at trial established the impermissible entrapment of appellant Antonio Gambino as a matter of law; (2) whether the district court abused its discretion pursuant to Federal Rule of Criminal Procedure 23(b) by allowing deliberations to proceed with an eleven person jury despite the availability of an alternate juror, or alternatively, whether the district court committed legal error in interpreting Rule 23(b) as precluding substitution of alternate jurors; and (3) whether appellant Rosario Gambino's sixth amendment right to effective assistance of counsel was violated because his trial lawyer's performance was adversely affected by a conflict of interest.[2]

## II.

## FACTUAL BACKGROUND

### Antonio Gambino

On October 23, 1983, during the course of an undercover operation investigating drug trafficking in the New Jersey area, Special Agent Michael Glass of the Federal Bureau of Investigation was introduced to Antonio Gambino by a government informant called "Hank." During the meeting, which was recorded by Agent Glass, Antonio Gambino agreed to sell Glass a small quantity of cocaine and also indicated that he had access to and could provide Glass with a sample of heroin. App. 1641a–1644a, 1654a–1656a. While Antonio never specifically disclosed the source of his drug supply, he intimated that his suppliers were members of his family. *See* App. 166a, 758a.

Following this meeting, Antonio met with Agent Glass on a number of occasions to sell cocaine and to continue discussions about the impending heroin deal. On December 27, 1983, shortly over two months after their initial meeting, Antonio Gambino supplied Agent Glass with a sample of heroin. Glass was in turn to deliver the sample to his contacts in Las Vegas who would then decide, based upon the quality of the sample, whether they wanted to purchase a kilogram. App. 781a–789a.

---

**2.** Other contentions raised by the appellants not directly addressed in this opinion, include:

 1. That remarks made by the prosecution in summation attacking the credibility of Anthony Spatola denied Rosario Gambino due process and a fair trial.

 2. That the district court erred in denying Rosario Gambino's motion for a new trial and a motion for related discovery.

 3. That appellants were denied a fair trial when the district court permitted the prosecutor to read an alleged prejudicial newspaper article to the jury.

 4. That Antonio Gambino's due process rights were violated by outrageous government conduct.

After thoroughly reviewing the above contentions, we conclude that they lack merit. Accordingly, the judgment of the district court will be affirmed.

Three days later, on December 30, 1983, Agent Glass telephoned Antonio and informed him that the sample was satisfactory and that he was interested in consummating their proposed heroin deal.

In another series of recorded conversations, Antonio Gambino, using code language, discussed the arrangements for the drug deal with various people. Thereafter, on January 18, 1984, Antonio Gambino, together with two of his co-conspirators, Anthony Spatola and Giovanni Bosco,[3] delivered approximately one half kilogram of heroin to Agent Glass and two other undercover agents. The transaction took place between Rooms 311 and 858 of Caesar's Boardwalk Regency Hotel in Atlantic City, New Jersey and was secretly videotaped by the FBI. On February 20, 1984, Antonio Gambino participated in the sale of a second half kilogram of heroin to Agent Glass and another undercover agent. Antonio Gambino's particular objection on appeal is that the evidence adduced at trial demonstrated entrapment as a matter of law.

*Anthony Spatola*

Immediately after Agent Glass authorized Antonio Gambino to negotiate the purchase of one kilogram of heroin, Anthony Spatola made a series of phone calls, which were intercepted by authorized wiretaps, attempting to contact Erasmo Gambino. Eventually a meeting between Erasmo Gambino and Anthony Spatola was arranged to discuss the proposed transaction. Spatola met with Erasmo at the Playboy Casino Hotel on January 3, 1984. On the following evening, Spatola was introduced to Agent Glass by Antonio Gambino in a meeting devoted to discussing the mechanics of the proposed heroin purchase. Agent Glass was required to wear a bathing suit and meet with Spatola in a jacuzzi at the Golden Eagle Motel in Cape May to assure that the meeting was not being recorded. App. 855a–857a. The heroin sale was scheduled for January 16 or 17.

On January 13, 1984, Agent Glass telephoned Antonio Gambino to advise him that all financial and personnel arrangements necessary for the completion of the heroin deal had been made. Glass suggested that the transaction occur on Tuesday, January 17, 1984. During this discussion, Antonio Gambino extensively used code language to refer to the heroin purchase, particularly employing references related to "marriage" and "cars." App. 241a–251a. Immediately thereafter, Antonio Gambino phoned Spatola and informed him that the sale would take place on Tuesday. App. 253a, 871a. Similar code language was used in this conversation and in a subsequent conversation between Spatola and Erasmo Gambino in which the two discussed the need to pick up the "fiance", i.e., heroin, on Monday.

Prior to the sale, intercepted telephone conversations and observations of surveillance agents revealed that Spatola made numerous attempts to contact Rosario and Erasmo Gambino either to obtain approval of the pending negotiations or to obtain the heroin for the drug deal. Ultimately, Spatola was present for the actual heroin sales on both January 19, 1984 and February 20, 1984. Spatola's appeal focuses on the propriety of the eleven person jury verdict.

*Erasmo Gambino*

Following Erasmo Gambino's meeting with Spatola at the Playboy Casino Hotel, a series of intercepted phone calls involving Antonio Gambino and Spatola revealed their persistent efforts to again contact Erasmo apparently to enlist his assistance in obtaining the heroin for the impending deal. App. 264a–265a, 270a–274a. Three of those calls were placed to the Caffe Milano in Brooklyn, New York. App. 275a–276a, 284a, 286a. Finally, on January 17, 1984, Erasmo placed a collect call to Spatola and told him that there had been a delay and that the sale could not be completed until Thursday. App. 306a–307a. After further efforts on the part of Spatola

---

**3.** Giovanni Bosco was a co-defendant in the underlying action. At the time of trial Bosco had not been arrested and remained a fugitive for over year. He was apprehended on April 19, 1985 and was awaiting trial at the time of this appeal.

and Antonio Gambino, however, a sale of approximately one half kilogram of heroin was arranged and completed early Wednesday morning.

During the discussions surrounding the transaction that morning, Antonio Gambino and Spatola discussed with undercover agents the possibility of providing a steady supply of heroin. App. 400a–438a. Left unresolved was the amount of heroin Antonio and Spatola would be able to produce on a monthly basis. On January 20, 1984 Antonio Gambino met with Special Agent Glass to continue discussions about future sales. App. 1048a–53a. Agent Glass told Antonio that before another deal could be approved, the quality of the heroin purchased two days earlier had to be tested. App. 1057a. Later that same day, Antonio had a telephone conversation with Erasmo Gambino in which Antonio stated "I spoke with him today … and he told me, its because he has to speak to that guy—the other guy, no?" App. 456a–57a. Antonio then suggested that he call Erasmo in five minutes from an "outside phone" so that he could "speak more freely." *Id.*

Two other phone calls involving Erasmo Gambino from which his involvement in the drug transactions could be inferred were intercepted by authorized wiretap on January 22, 1984. App. 503a, 546a. Prior to the sale of the second half kilogram, Erasmo was observed with Spatola and Giovanni Bosco in Brooklyn at the Caffe Milano on February 2, 1984. App. 2667a–2670a. Several days later Erasmo apparently met with Spatola and Antonio Gambino in Philadelphia. App. 604a–605a, 608a–609a, 2066a–2067a. The second heroin transaction was completed on February 20, 1984. Both Spatola and Antonio were present at the sale.

Erasmo Gambino's principal contention on appeal alleges reversible error in the district court's decision to proceed with an eleven person jury.

### Rosario Gambino

Rosario Gambino was first implicated in the heroin conspiracy on January 17, 1984 when Anthony Spatola and Antonio Gambino were desperately seeking heroin to sell to Agent Glass the following day. On that day Spatola and Giovanni Bosco met at the Caffe Milano in Brooklyn at approximately 2:27 p.m. App. 2091a–2094a, 2109a–2110a. Approximately thirteen minutes later, a yellow Mercedes Benz bearing New Jersey registration 228–VIF was observed leaving the curb in front of Caffe Milano. App. 2080a. Although the residence and insurance policy listed on the registration were false, App. 2471a–2472a, 2571a–2573a, during the course of the investigation the automobile was frequently observed at the residence or in the use of Rosario Gambino. App. 2215a–2216a, 2473a.

In an intercepted phone conversation later that day, Anthony Spatola conveyed to Antonio Gambino that he had talked to his cousin,[4] the "short guy," who indicated that he would try to get the "car." App. 318a–319a. About an hour later, Spatola again talked to Antonio, this time to confirm that the "short guy" would produce one half of the heroin immediately as a favor to Spatola. App. 321a. In yet another phone conversation, between Spatola and Antonio, Spatola indicated that the heroin would arrive at the Caffe Milano between eleven and eleven-thirty that evening. App. 968a–972a. At approximately 11:19 p.m., the yellow Mercedes was again observed at the Caffe Milano, and at 11:29 p.m., it was observed departing. App. 2237a–2238a.

Spatola and Bosco left the Caffe Milano at 1:10 a.m. on January 18, 1984, and drove to Caesar's Boardwalk Regency Hotel in Atlantic City where the drug transaction was completed. App. 349a–438a, 2239a–2240a. Spatola, Bosco and Antonio Gambino rented Room 311 at Caesar's to use during the drug transaction. At approximately 8:20 a.m., shortly before Spatola, Bosco and Antonio checked out of the hotel, a call was placed from Room 311 to the residence of Rosario Gambino. App. 2047a–2051a. Upon leaving the hotel, Spa-

---

4. Rosario Gambino and Anthony Spatola are cousins. App. 4608a.

tola, Bosco and Antonio drove directly to Rosario Gambino's residence in Cherry Hill, New Jersey, arriving there at approximately 9:30 a.m. App. 2475a. Parked outside of Rosario's residence when the trio arrived was the yellow Mercedes Benz, New Jersey registration number 228–VIF. App. 2579a. The three men left Rosario's home at about 10:40 a.m. App. 2502a.

Pursuant to ongoing heroin negotiations, Agent Glass communicated with Antonio Gambino several times after the January 18 transaction to determine whether future sales would occur. These negotiations were complicated by highly publicized heroin arrests which took place in Philadelphia on January 26, 1984. During a meeting with Spatola and Antonio Gambino on January 27, Agent Glass showed them a Philadelphia Daily News article in which the arrests were discussed. App. 1161a. There were many similarities between the ongoing heroin negotiations and the ones which had taken place in Philadelphia, including complaints about dilution of the heroin. App. 1162a–1168a. Consequently, Agent Glass encountered some difficulty in making arrangements for the second purchase. App. 515a–579a.

On January 30, 1984 a number of phone calls either directly involving Rosario Gambino or making reference to him through code names such as "Saruzzo" and "the short one," were intercepted by FBI wiretap. App. 586a–592a. Those conversations revealed ongoing efforts to schedule a second sale of heroin to Agent Glass. Eventually an agreement was reached to conduct the next sale on February 2, 1984. App. 594a. The planned transaction was aborted, however, due to the continuing apprehensiveness of Antonio's suppliers in the wake of the Philadelphia arrests. App. 1242a.

Finally, on February 20, 1984, the second transaction was completed. Agent Glass and another undercover agent purchased a second half kilogram of heroin from Anto-

nio and Spatola for $120,000. App. 622a–669a, 1352a. Copies of the bills used to purchase the heroin were made and maintained. App. 1352a. On March 16, 1984 Rosario Gambino was arrested and a search of his residence conducted. Two of the $100 bills used to purchase the heroin were seized from Rosario Gambino's master bedroom. App. 3421a–3422a, 4035a, 4130a.

On appeal, Rosario Gambino alleges that his sixth amendment right to effective assistance of counsel was violated because his trial lawyer's performance was adversely affected by a conflict of interest.

### III.

*ENTRAPMENT*

In this circuit, to be entitled to an entrapment charge, a defendant must first present evidence both that the government initiated the crime, regardless of the amount of pressure applied, and that the defendant was otherwise not predisposed to commit the crime. *See United States v. Jannotti*, 729 F.2d 213, 224 (3d Cir.1984) (*Jannotti II*) (citing *United States v. Watson*, 489 F.2d 504, 509 (3d Cir.1973)). In the instant case, appellant Antonio Gambino demanded an entrapment charge based on evidence that (a) Special Agent Glass initiated the topic of heroin sales during negotiations for a cocaine purchase, and (b) there were several instances in their initial meeting where Antonio expressed hesitancy to arrange the heroin sale, and later where his lack of knowledge about the heroin business was revealed to Agent Glass. App. 4943a–4944a. Accordingly, the trial judge submitted the issue of entrapment to the jury pursuant to a jury charge which is not challenged on this appeal. App. 5876a–5878a. The jury rejected the defense of entrapment and returned a verdict of guilty against Antonio Gambino on ten of the twelve counts with which he was charged.[5] Antonio Gambino argues on

---

5. The only two counts upon which Antonio was acquitted were counts 6 and 9 in which he was charged along with Mario Gambino with using

the telephone to facilitate a conspiracy to distribute heroin. These were the only telephone

appeal that his convictions nevertheless should be reversed because he was entrapped as a matter of law. We disagree.

Although appellant Antonio Gambino met the threshold evidentiary requirements entitling him to an entrapment instruction, we are unconvinced on this record that he is entitled to have his defense sustained as a matter of law. Where the evidence is undisputed that the defendant had no predisposition to commit the crimes with which he is charged, and was induced to do so only by the trickery, persuasion or fraud of the government, entrapment is established as a matter of law. *See United States v. Kaminski*, 703 F.2d 1004, 1007 (7th Cir. 1983). *See also Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958) ("Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials"; *United States v. Jannotti*, 673 F.2d 578, 597 (3d Cir.) (en banc), *cert. denied*, 45 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (*Jannotti I*) ("Entrapment occurs when a defendant who was not predisposed to commit the crime does so as a result of the government's inducement"). In general, however, entrapment is a jury question, *see United States v. Bocra*, 623 F.2d 281, 289 (3d Cir.), *cert. denied*, 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980), and "[t]he ultimate factual decisions ... must be left to the jury." *Jannotti I*, 673 F.2d at 606.

▆ To establish his claim of entrapment as a matter of law, Antonio Gambino first argues that Special Agent Glass induced him to sell heroin. However, even if the agent is presumed to have induced the sale by his initial inquiry and subsequent expressions of interest, government inducement alone does not establish entrapment as a matter of law. Rather, the key consideration upon review is whether the undisputed evidence shows a lack of predisposition on the part of the accused. *Hampton v. United States*, 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 436,

93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973). Evidence concerning predisposition is not undisputed if the determination depends upon the credibility of witnesses or the interpretation of the evidence. *See United States v. Pennell*, 737 F.2d 521, 534 (6th Cir.1984), *cert. denied*, ── U.S. ──, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *Bocra*, 623 F.2d at 289; *United States v. Spain*, 536 F.2d 170, 173–74 (7th Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976).

▆ Appellant presents two arguments alleging that the undisputed evidence demonstrates his lack of predisposition to engage in the criminal conduct for which he was convicted. First, Antonio Gambino argues that government evidence regarding his involvement in cocaine trafficking established predisposition to sell only cocaine, not heroin. In support of his position, however, appellant can point only to the eloquent dictum of Mr. Justice Frankfurter in *Sherman:* "No matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society." 356 U.S. at 382–83, 78 S.Ct. 825–26 (Frankfurter, J. concurring in result). In so doing, however, appellant merely attempts to shift the focus away from his own behavior by rehashing the proposition that has been considered and rejected several times by the United States Supreme Court, *viz.* whether excessive governmental conduct, if proved, in itself negates evidence of predisposition, or, put otherwise, whether the entrapment defense should be defined in terms of the government's conduct rather than the defendant's state of mind. *See Hampton v. United States*, 425 U.S. 484, 495–99, 96 S.Ct. 1646, 1652–55, 48 L.Ed.2d 113 (1976) (Brennan, J. dissenting); *United States v. Russell*, 411 U.S. 423, 437–39, 439–43, 93 S.Ct. 1637, 1645–46, 1646–48, 36 L.Ed.2d 366 (1973) (Douglas, J. dissenting)

counts with which Mario Gambino was charged

and he was acquitted of all charges.

(Stewart, J. dissenting); *Sherman v. United States*, 356 U.S. 369, 378–83, 78 S.Ct. 819, 823–26, 2 L.Ed.2d 848 (1952) (Frankfurter, J. concurring in result); *Sorrells v. United States*, 287 U.S. 435, 458–59, 53 S.Ct. 210, 218–19, 77 L.Ed. 413 (1932) (Roberts, J. dissenting).[6] While we recognize that government inducement is not wholly irrelevant to the determination of defendant's predisposition, *see Watson*, 489 F.2d at 511 ("the stronger the inducement, the more likely that any resulting criminal conduct of the defendant was due to the inducement rather than to the defendant's own predisposition"), in ascertaining predisposition we focus on 'the defendant's state of mind and inclinations *before his initial exposure to government agents.'* *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir.1983) (quoting *United States v. Jannotti*, 501 F.Supp. 1182, 1191 (E.D. Pa.1980), *rev'd on other grounds*, 673 F.2d 578 (3rd Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (emphasis added)).

An appellate court reviewing a record in an effort to divine a defendant's predisposition to commit a crime must examine a variety of factors. The second circuit has enumerated three categories of evidence from which the government may discharge its burden of proof on the issue of predisposition: "the Government may prove propensity by showing (1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *United States v. Viviano*, 437 F.2d 295, 299 (2d Cir.), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971).[7] Evidence of Antonio Gambino's ongoing involvement in cocaine trafficking is clearly subsumed by the category of evidence noted in item one. Nevertheless, appellant submits that evidence of such involvement cannot provide the basis for a determination that he was predisposed to engage in similar activity where the government agent conceded that his "primary goal" was to induce appellant to engage in the sale of heroin.

■ Other courts, however, although focusing on problems of admissibility, have recognized the probative value of similar acts evidence on the issue of a defendant's predisposition to commit comparable crimes where a defense of entrapment was raised. *See e.g., United States v. Segovia*, 576 F.2d 251, 252–53 (9th Cir.1978) ("the probative value of appellant's willingness to arrange for a sale of a significant quantity of marijuana in the context of his entrapment de-

---

**6.** In *United States v. Russell,* the majority opinion conceded that there "may some day be ... a situation in which the conduct of the law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." 411 U.S. at 431–32, 93 S.Ct. at 1642–43. Subsequently, this court accorded recognition to this principle in *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), holding on its facts that the "nature and extent of police involvement ... was so overreaching as to bar prosecution of the defendants as a matter of due process of law." 588 F.2d at 377.

Antonio Gambino separately alleges a due process violation and implores this Court to overturn his conviction even if we find sufficient evidence on the issue of predisposition. Despite the holding in *Twigg*, this court and other appellate courts have since exercised extreme caution in finding due process violations in undercover settings. *See e.g., United States v. Beverly*, 723 F.2d 11, 12–13 (3d Cir.1983); *United States v. Alexandro*, 675 F.2d 34, 40–41 (2d Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *Jannotti I*, 673 F.2d at 607–608. Thus, "a successful due process defense must be predicated on intolerable government conduct," and an appellate court should "exercise scrupulous restraint before ... denounc[ing] law enforcement conduct as constitutionally unacceptable." *Jannotti I*, 673 F.2d at 607. On the facts before us, we do not find the type of egregious government misconduct that is repugnant to the concept of fundamental fairness. Accordingly, we reject Antonio's due process argument.

**7.** We cite *Viviano* solely to illustrate the types of evidence which may support a finding of predisposition. Nothing in our reliance on *Viviano* affects this court's rejection of the bifurcated entrapment charge, *see Jannotti II*, 729 F.2d at 224, embraced in that opinion.

fense in a trial for similar activities involving cocaine cannot be disputed"); *see also United States v. Williams*, 705 F.2d 603, 623 (2nd Cir.1983) (in ABSCAM prosecution evidence of conduct 'morally indistinquishable' from offense charged was probative of defendant's willingness to engage in similar activity); *cf. United States v. Murzyn*, 631 F.2d 525, 528–29 (7th Cir.1980) (discussing the appropriate and reasonable restraints on the use of character evidence to prove disposition). The dictum quoted in *Segovia* is particularly apropos:

> "Merely because the drugs involved are different does not strip this conduct of its evidentiary value. The past acts of negotiation leading to the distribution of one drug is [are] relevant to show knowledge, motive and intent on the part of appellant to partake in the attempt here to import commercial quantities of yet another drug for purposes of distribution. The relevant factor is the type of activity undertaken, not the identity of the drugs."

*Segovia*, 576 F.2d at 252 (quoting *United States v. Batts*, 573 F.2d 599, 603 (9th Cir.1978)). That the determination of the weight of the evidence and inferences to be drawn therefrom is exclusively within the province of the jury is a vital linchpin of our criminal justice system. We think that the issue whether appellant's involvement in the heroin transactions for which he was convicted was solely a result of government inducement or rather, the result of a predisposed criminal mind as evidenced by his prior cocaine dealings, was properly left to the jury.

Nor do we find any persuasive force in Antonio Gambino's suggestion that, viewed independently of government inducement, evidence of his prior involvement with cocaine was insufficient to establish predisposition. Indeed, we need not reach the issue whether, standing alone, evidence of prior similar activity is sufficient proof of predisposition, for there is ample additional evidence on this record from which predisposition may be inferred.[8]

The record reflects, despite appellant's contention to the contrary, that the government also produced evidence that Antonio exhibited a willingness to enter into the heroin transactions. Relying on *United States v. McLernon*, 746 F.2d 1098 (6th Cir.1984), Antonio Gambino argues that his initial reluctance to engage in heroin sales was only overcome after repeated inducements by Agent Glass. We do not find Gambino's argument convincing. The facts of *McLernon* are clearly distinguishable from those presented in this case. *McLernon* involved a situation whereby a government agent over a period of years became the accused's "blood-brother," and preyed upon that relationship by convincing the accused that the agent would be murdered if the accused did not aid in negotiating a cocaine deal. *McLernon*, 746 F.2d at 1113. We conclude that the evidence with regard to Antonio's willingness to sell heroin and the sundry interpretations urged by the parties were properly before the jury for resolution. On review, our task is to determine whether, viewing the evidence in the light most favorable to the government, there was sufficient evidence for a rational jury to find that the defendant was predisposed. *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978); *Jannotti I*, 673 F.2d at 598. After a thorough examination of the record before us, we do not find that the jury was unreasonable in concluding beyond a reasonable doubt that Antonio Gambino was predisposed to engage in heroin trafficking. Accordingly, the jury's determination will not be disturbed.

## IV.

### *RULE 23(b) AND THE ELEVEN–PERSON JURY*

Appellants Erasmo Gambino and Anthony Spatola both contend that the district

---

**8.** Antonio Gambino argues that "[t]he only evidence of predisposition on the part of appellant rests upon the allegation that he had previously sold cocaine." Brief for Appellant Antonio Gambino at 7.

court committed reversible error when, after excusing a juror for cause after jury deliberations had commenced, the court permitted a verdict to be returned by an eleven-person panel over the objection of all of the defendants.[9] Appellants concede that they have no constitutional right to a twelve-person jury, *see Williams v. Florida,* 399 U.S. 78, 103, 90 S.Ct. 1893, 1907, 26 L.Ed.2d 446 (1970), but insist that where alternate jurors are available, albeit in contravention of Federal Rule of Criminal Procedure 24(c)[10], defendants are entitled, at a minimum, to a determination whether the jury could begin its deliberations anew upon the substitution of a properly sequestered alternate. Absent a finding of potential prejudice to the parties, appellants argue that the preference of the defendants—in this case juror-substitution—should be honored.

The events precipitating this challenge are as follows:[11]

At the time that the jury retired to begin deliberations, Judge Lacey decided to retain two alternate jurors in sequestration. App. 5903a–5909a. After over twenty hours of deliberation, the jury notified the court through their foreman that three documents, not marked into evidence, had been discovered in the exhibit box. The court immediately marked the note from the jury and the three documents as Court Exhibits C–22, (a), (b), and (c), respectively, and promptly conducted an inquiry into the

matter with counsel and in the presence of all of the defendants.

Upon questioning the jury panel, the court determined that only jurors four and five had seen any of the unauthorized documents. Neither juror had discussed what they had viewed with the other members of the panel. Only one of the two, juror number five, had viewed a document that the court and counsel considered potentially prejudicial. As a result, at the conclusion of the hearing all defense counsel joined in a motion to remove juror number five and substitute him with one of the two alternates the court had retained at the time the jury retired. The government did not oppose this request. Notwithstanding the desires of defense attorneys to return the jury to its full complement of twelve, the court found just cause to remove juror number five but refused to replace him with the first alternate, noting instead that Rule 23(b) compelled him to proceed with an eleven person jury. At that juncture the court discharged the two alternate jurors. Later that day, the remaining 11 jurors rendered a verdict.

Rule 23(b)[12] of the Federal Rules of Criminal Procedure authorizes the trial court, in its discretion, to proceed with a jury of eleven in the event a juror is excused for cause after the jury has retired to consider its verdict. Appellants argue nonetheless that Judge Lacey misinterpreted Rule 23(b) as precluding the option of substituting an available alternate for the excused juror.[13] Thus, appellants do not

---

**9.** Each appellant has invoked Rule 28(i) of the Federal Rules of Appellate Procedure, joining the arguments of their co-appellants insofar as those arguments are applicable to them and not inconsistent with the arguments in their briefs. Presumably, all appellants join in this argument.

**10.** *See infra* note 13.

**11.** A more detailed account of these facts is found in Judge Lacey's opinion in *United States v. Gambino,* 598 F.Supp. 646, 658–60 (D.N.J. 1984).

**12.** Rule 23(b) provides:

(b) **Jury of Less Than Twelve.** Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approv-

al of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors. **Fed.R.Crim.Pro. 23(b).**

**13.** Rule 23(b) makes no provision for the substitution of alternate jurors. Juror substitution is authorized and governed by the provision of Rule 24(c) of the Federal Rules of Criminal Procedure which provides in pertinent part:

(c) **Alternate Jurors.** The court may direct that not more than 6 jurors in addition to the

challenge the district court's discretion to proceed with an eleven-person jury; rather, they charge that that discretion was supplanted by Judge Lacey's implementation of what he erroneously believed to be the sole mandate of Rule 23(b). We simply find no merit to appellants' contention.

Prior to August 1, 1983, Rule 23(b) required the stipulation of counsel in order to proceed with an eleven-person jury. Meanwhile, Federal Rule of Criminal Procedure 24(c)[14] required that all alternate jurors be excused at the time the case was submitted to the jury for deliberation. Thus, the interaction between Rules 23(b) and 24(c) enabled defendants to force a mistrial if a juror became incapacitated during deliberations, for absent stipulation the court could not proceed with a jury of eleven and post-submission substitution was barred by 24(c). As a result, particularly after lengthy trials, some judges took the precaution of retaining alternates, in clear violation of 24(c), in order to avoid mistrial if counsel refused to proceed with a jury of eleven after a juror became incapacitated during deliberations. Appellate courts reviewing this problem invariably held that a departure from the plain language of Rule 24(c) would not automatically constitute reversible error; rather, the verdict would be sustained absent a showing of prejudice to defendant. *See, e.g., United States v. Hillard,* 701 F.2d 1052, 1058 (2d Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983); *United States v. Kopituk,* 690 F.2d 1289, 1309–11 (11th Cir. 1982), *cert. denied sub. nom., Turner v. United States,* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983); *United States v. Phillips,* 664 F.2d 971, 994–96 (5th Cir.

1981), *cert. denied sub. nom., Meinster v. United States,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). In so doing, however, these courts refused to endorse violations of Rule 24(c) as a matter of course. The Eleventh Circuit in *Kopituk, supra,* noted:

> It is not our intention, nor is it within our province, to authorize routine deviation from the terms of Rule 24(c). That rule is 'the rule' and the substituted juror procedure upheld herein is a narrowly limited exception to the rule, applicable only in extraordinary situations and, even then, only when extraordinary precautions are taken ... to ensure that the defendants are not prejudiced.

*Kopituk,* 690 F.2d at 1311.

■ We begin our analysis of procedures employed by Judge Lacey, then, with the observation that the initial decision by the district court to retain and sequester two alternate jurors once the case had been submitted to the jury was a clear violation of Rule 24(c). *Accord Phillips,* 664 F.2d at 994. The unique position advanced on this appeal, however, does not allege error in the violation of Rule 24(c). Instead, appellants, in effect, challenge the failure of the district judge to violate (or at a minimum, seriously consider violating) the rule *in toto.* Appellants' proposition is absurd.

When the Advisory Committee on the Federal Rules of Criminal Procedure studied the interaction between Rules 23(b) and 24(c) and, specifically, the stumbling block imposed by the stipulation requirement, it explicitly rejected the proposed solution of amending Rule 24(c) to permit substitution.[15] The Committee's aversion to the

---

regular jury to be called and impaneled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties.... An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. **Fed.R.Crim.Pro. 24(c).** Although 24(c) requires that alternate jurors be discharged once the jury retires for deliberations, Judge Lacey had retained and sequestered two alternates who re-

mained available at the time the disqualified juror was dismissed. *See* discussion *infra.*

**14.** *See supra* note 13.

**15.** For a review of the rejected proposed rule permitting juror substitution following the commencement of jury deliberations, see Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure, 91 F.R.D. 289, 341–45 (1981).

juror-substitution option is beyond doubt. The Committee noted:

> There have been proposals that the rule should be amended to permit an alternate to be substituted if a regular juror becomes unable to perform his duties after the case has been submitted to the jury. An early draft of the original Criminal Rules had contained such a provision, but it was withdrawn when the Supreme Court itself indicated to the Advisory Committee on the Criminal Rules doubts as to the desirability and constitutionality of such a procedure. These doubts are as forceful now as they were a quarter century ago. To permit substitution of an alternate after deliberations have begun would require either that the alternate participate though he has missed part of the jury discussion, or that he sit in with the jury in every case on the chance he might be needed. Either course is subject to practical difficulty and to strong constitutional objection.

Advisory Committee Note, 97 F.R.D. 245, 300 (1983) (quoting Wright, Federal Practice and Procedure § 388 (1969)). Instead, the Committee concluded that the better alternative was to amend 23(b) to permit the judge, on his own motion, to proceed with a jury of eleven. The amendment was thus designed to avert the dilemma posed by the very cases on which appellants now rely, *e.g., Phillips, supra.*

■ Although the primary objective of the amendment to Rule 23(b) is to provide judges with an alternative to mistrial after a juror is excused for cause, the amendment also contemplates compliance with Rule 24(c). Because the amendment does not allow the court, on its own motion, to proceed with a panel of *less* than eleven, however, Judge Lacey retained the two alternates as a precaution were he later confronted with the necessity of excusing two

jurors for cause.[16] *See United States v. Gambino,* 598 F.Supp. 646, 660 (D.N.J. 1984). That potentiality never materialized and, therefore, Judge Lacey was not forced to journey into unknown territory. He was instead faced with a set of circumstances for which a solution had been devised, *viz.* Rule 23(b), a solution which appellants urge us to ignore. We refuse to do so. It is clear from the record that the district court did not abuse its discretion under Rule 23(b) in opting for the eleven-panel verdict. It is equally clear that under Rule 23(b) Judge Lacey did all that he was required to do. "The [Rule] provides that if a juror is excused after the jury has retired to consider its verdict, *it is within the discretion of the court whether to declare mistrial or to permit deliberations to continue with 11 jurors.*" 97 F.R.D. at 301 (emphasis added). The court was under no obligation to consider the feasibility of any other options, particularly one which was explicitly disfavored as a remedial device by the Rules Committee that studied and revised Rule 23(b).

## V.

### CONFLICT OF INTEREST

Rosario Gambino alleges that his sixth amendment right to effective assistance of counsel was violated because his trial lawyer's performance was adversely affected by a conflict of interest. The factual predicate of this claim rests upon the simultaneous representation of Rosario Gambino and Gaetano Mazzara by defense attorney, Jacob Evseroff. While representing Rosario at the trial level in the instant action, Mr. Evseroff had also been retained as counsel for Gaetano Mazzara in *United States v. Badalamenti, et al.,* No. 84–Cr–286, a narcotics conspiracy case pending in the United States District Court for the Southern District of New York. Documents filed in

---

**16.** Judge Lacey's action in anticipation of the dismissal of two jurors is not challenged before this court. Accordingly, we express no opinion as to the propriety or desirability of such action. We note, however, that Judge Lacey's apprehensions were not unfounded. Indeed, it is merely

fortuitous that juror number four did not also view the document that necessitated the dismissal of juror number five, or that the document viewed by juror number four was deemed innocuous by the court and counsel. *See United States v. Gambino,* 598 F.Supp. at 658.

connection with the prosecution's case in *Badalamenti* indicated that Mazzara was also under suspicion as the source of the heroin sold to undercover agents by Anthony Spatola and Antonio Gambino on January 18, 1984. Rosario Gambino argues that Mr. Evseroff's dual representation created an actual conflict of interest because "for Mr. Evseroff to demonstrate that it was not Rosario Gambino, but Mazzara, who supplied the heroin would breach his duty of loyalty to Mazzara. Thus counsel's fidelity to Rosario Gambino—including inculpating Mazzara to exculpate Gambino—clashed with his allegiance to Mazzara." Brief of Rosario Gambino at 24–25.

### A.

A litany of cases in this circuit firmly establish our general policy against entertaining ineffective assistance of counsel claims on direct appeal, *see e.g., Government of the Virgin Islands v. George,* 741 F.2d 643, 646 (3d Cir.1984); *United States v. Davis,* 710 F.2d 104, 110 (3d Cir.1983); *United States v. Frankenberry,* 696 F.2d 239, 241–42 (3d Cir.1982); *United States v. Sturm,* 671 F.2d 749, 750–51 (3d Cir.1982) (per curiam), *cert. denied,* 459 U.S. 842, 103 S.Ct. 95, 74 L.Ed.2d 86 (1985); *United States v. Jackson,* 649 F.2d 967, 973 (3d Cir.), *cert. denied,* 454 U.S. 871, 1034, 102 S.Ct. 341, 574, 70 L.Ed.2d 176, 479 (1981); *United States v. Rad-O-Lite of Philadelphia, Inc.,* 612 F.2d 740, 743–44 (3d Cir. 1979); *United States v. Garcia,* 544 F.2d 681, 684 n. 1 (3d Cir.1976). The rationale underlying this preferred policy is that ofttimes such claims involve allegations and evidence that are either absent from or not readily apparent on the record. Thus, we have maintained that the better course is for the accused to pursue his objections in an appropriate collateral proceeding, *see e.g.,* 28 U.S.C. § 2255, where the district court may compile a sufficient factual record thereby facilitating appellate review.

Recently, in *Government of the Virgin Islands v. Zepp,* 748 F.2d 125 (3d Cir.1984), this court had occasion to carve out a narrow exception to the general rule against hearing ineffective assistance of counsel claims on direct appeal. Therein we held that "where an objection has been properly made at trial, or, where the record clearly shows actual conflict of interest and objections made at trial did or should have put the trial court on notice that potential conflict of interest existed, this court's 'preference' for developing such issues on collateral attack need not be followed, and a full consideration of the issue is appropriate." *Zepp,* 748 F.2d at 134. In arriving at this conclusion, we observed the teachings of two contemporaneous United States Supreme Court decisions.

In *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court was asked to determine the proper standards for judging sixth amendment claims of ineffective assistance of counsel. Claims of ineffective assistance of counsel may be broadly categorized into two groups: (1) those claims primarily founded upon external factors,[17] and (2) those founded upon the actual conduct or misconduct of the trial lawyer. Moreover, as observed in *Strickland* and *Cronic,* claims that involve allegations of attorney misconduct may be further divided into (1) those premised on the incompetence of

---

17. In *Cronic* the Supreme Court acknowledged ineffective assistance claims "based on actual or constructive denial of the assistance of counsel altogether, as well as claims based on state interference with the ability of counsel to render effective assistance to the accused." *Strickland,* 104 S.Ct. at 2062 (citing *Cronic,* 104 S.Ct. at 2047–48). Such claims contemplate particularly egregious circumstances such as where the defendant is denied the assistance of counsel at a critical stage of the litigation prosecution.

*Cronic,* 104 S.Ct. at 2047 & n. 25, or where external interference prevents even the most able lawyer from providing meaningful assistance, *see Cronic,* 104 S.Ct. 2047–48 (citing *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). The Court concluded that "when surrounding circumstances justify a presumption of ineffectiveness ... a Sixth Amendment claim [may] be sufficient without inquiry into counsel's actual performance at trial." *Cronic,* 104 S.Ct. at 2048.

counsel due to specific errors or omissions during the course of representation, *Cronic,* 104 S.Ct. at 2046 n. 20; *Strickland,* 104 S.Ct. at 2064–69; or (2) those premised on an actual conflict of interest that adversely affected counsel's performance, *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *Strickland,* 104 S.Ct. at 2067. Under the first type of claim, where an ineffective assistance claim alleges deficient performance by trial counsel, the Court instructed that a defendant must "affirmatively prove prejudice." *Strickland,* 104 S.Ct. at 2067. Upon addressing the burden to be borne by an accused advancing an ineffective assistance of counsel claim due to an actual conflict of interest, however, the *Strickland* Court reiterated its prior pronouncement, announced in *Cuyler v. Sullivan,* that an actual conflict of interest warrants a *presumption* of prejudice. *See Strickland,* 104 S.Ct. at 2067.

■ It is important to note that overemphasis on the presumption of prejudice cannot operate to obviate the requisite obligation to demonstrate the existence of an actual conflict. "Prejudice is presumed *only* if the defendant demonstrates that counsel 'actively represented conflicting interests' and 'that an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland,* 104 S.Ct. at 2067 (quoting *Cuyler v. Sullivan,* 446 U.S. at 350, 348, 100 S.Ct. at 1719, 1718) (emphasis added). Thus, the less stringent test to obtain relief under the sixth amendment for conflicts of interest does not give rise to a less stringent standard in determining whether such claims should be resolved on direct appeal. As we stated in *Zepp,* the desirability of leaving to the district court, in the first instance, the development of an appropriate factual record, whether through an evidentiary hearing or in the course of a habeas corpus collateral proceeding, is equally applicable to claims of

ineffective assistance of counsel based on a conflict of interest as to those based on trial counsel's incompetence. *See Zepp,* 748 F.2d at 133. The critical inquiry on this direct appeal, then, is whether the record evidence demonstrates that Jacob Evseroff "actively represented conflicting interests."

### B.

"Actual conflict of interest is evidenced if, during the course of representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action.... This conflict must cause some lapse in representation contrary to the defendant's interests but such lapse need not rise to the level of actual prejudice." *Sullivan v. Cuyler,* 723 F.2d 1077, 1086 (3d Cir.1983) (*Sullivan II*).

Following trial in this matter, appellant Rosario Gambino filed a Rule 33 motion for a new trial. Fed.R.Crim.Pro. 33. Relying on various statements contained in government pleadings filed in the *Badalamenti* narcotics case, Rosario Gambino argued, *inter alia,* that those "documents conclusively demonstrate that prior to Rosario Gambino's trial the government was in possession of evidence which it contended demonstrated that Spatola and Bosco obtained the heroin [for the January 18, 1984 transaction] not from Rosario Gambino but instead from Castronovo and Mazzara or through their agent, Joseph LaRosa." App. 65a. Accordingly, Rosario Gambino requested that Judge Lacey order a new trial on the ground of newly discovered evidence.[18]

■ Our review of the record on the Rule 33 motion reveals that, though not specifically raising a claim of ineffective assistance of counsel, Rosario, through newly acquired counsel, twice alluded to a potential conflict of interest in memorandum filed in support of his motion.[19] First,

---

**18.** Rosario Gambino alleges reversible error in the district court's denial of his motion for a new trial. After reviewing the record and the claims of appellant, we do not find that the trial

judge improperly denied Gambino's motion for a new trial.

**19.** We acknowledge that the positive record evidence relied on by appellant as demonstrative

in the course of responding to the government's position that documents and the information contained therein were not newly discovered evidence, Rosario argued that "[s]urely, the government could not expect Rosario Gambino's attorney to contend that his other client, Gaetano Mazzara, might have supplied the heroin, especially in view of the total lack of any such claim by the government at the Gambino trial." App. 84a–85a. Then, in response to the government's contention that the *Badalamenti* documents could have been discovered through due diligence of trial counsel, Rosario Gambino's memorandum again observed the potential conflict: "Surely [Mr. Evseroff] cannot be considered to be less than diligent for failing to review documents in a wholly separate case to see whether those documents might impact upon Rosario Gambino's trial. This is especially true when the government did not in any way indicate to him that it knew that the case might be interrelated and that he would have a clear and unquestionable conflict of interest between his two clients, Rosario Gambino and Gaetano Mazzara." App. 86a–87a.

Upon ruling on appellant's motion for a new trial, Judge Lacey found that the information regarding Mazzara and Castronovo was contained in documents that were made public well in advance of Rosario Gambino's trial and therefore, was available to the defense in the exercise of due diligence. App. 151a. In addition, Judge Lacey expressly noted that in his capacity as attorney of record for Mazzara in the *Badalamenti* proceeding, Mr. Evseroff had actual possession of the information now labeled as newly discovered. Finally, Judge Lacey concluded that, notwithstanding any constructive notice afforded to counsel, Mr. Evseroff was actually provided with a surveillance log—J–146—of the events of January 17, 1984 at the Caffe Milano during the course of the trial. The judge observed:

> This very exhibit was used carefully and deliberately by Mr. Evseroff in his cross-examination of surveillance agents.... J–146 contains several log entries naming and noting the observation of Gaetano Mazzara and Francesco Castronovo at the Caffe Milano, consistent of course with what is now so heavily relied upon by the defendant. While Mr. Evseroff and other defense counsel conducted extensive cross-examination of the surveillance agents, not one elected to question the agents about the activities of Gaetano Mazzara and Francesco Castronovo at the Caffe Milano on that date.

App. 151–52a.

■ At the outset, Rosario Gambino asserts that multiple representation [20] is clearly established on the record by Mr. Evseroff's undertaking to simultaneously defend, albeit in separate proceedings in federal courts in New Jersey and New

---

of an actual conflict consists exclusively of documents filed in connection with appellant's Rule 33 motion. The requirement that an objection be properly raised at trial, however, is not a rigid, mechanical rule blind to valid claims properly raised in pre- or post-trial proceedings. *See e.g., Zepp,* 748 F.2d at 134 n. 9 (recognizing conflict claims raised during suppression hearing); *Cronic,* 104 S.Ct. at 2051 n. 42 (acknowledging that an ineffective assistance claim properly raised and ruled on in a Rule 33 motion for a new trial may be considered on direct appeal); *cf. American Home Assurance Co. v. Sunshine Supermarket, Inc.,* 753 F.2d 321, 324–25 (3d Cir. 1985) (objection when evidence of nonprosecution was introduced during hearing on motion *in limine* was not required to preserve for appeal the specific issue raised in the motion).

**20.** In *Sullivan II* we noted that a conflict of interest violative of the sixth amendment is es-

tablished upon proof of (1) multiple representation that, (2) creates an actual conflict of interest that (3) results in an adverse effect upon the lawyer's performance. 723 F.2d at 1084. We subsequently acknowledged in *Zepp* that "our decision [in *Sullivan II*] must not be construed so narrowly as to encompass only those factual situations where counsel simultaneously represents different defendants." 748 F.2d at 135. Thus, traditional multiple representation remains a salient, though non-essential, element of a cognizable conflict of interest claim. Rosario alleges multiple representation in the defense of two clients not defendants in the same trial. Our key consideration remains whether trial counsel "actively represented conflicting interests." *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719.

York, two clients accused of committing the exact same crime. He then turns to Judge Lacey's findings on the Rule 33 motion and argues that those findings constitute direct record evidence of Mr. Evseroff's conflict of interest.

In addition to his reliance on evidence emanating from the Rule 33 motion, Rosario argues that the actual conflict posed by Mr. Evseroff's dual representation is established by certain omissions noted during the course of the trial: (1) counsel's failure to shift suspicion away from his client by questioning government agents about Mazzara's involvement in the January 18 drug transaction, (2) counsel's failure to investigate and obtain additional witnesses to implicate Mazzara and exonerate Rosario, and (3) counsel's failure to vigorously suggest to the jury during summation that Mazzara was the supplier of the heroin. The failure to advance such a defense, Rosario contends, is tantamount to a serious lapse in representation that clearly indicates that Mr. Evseroff labored under an actual conflict of interest that adversely affected his performance. Finally, Rosario points to Mr. Evseroff's failure to alert the trial judge of counsel's dual representation of Mazzara prior to trial, or at the earliest point during trial after which the conflict became apparent, as an impermissible lapse in representation.[21] Thus, Rosario Gambino concludes that the record before this court is adequate to review his ineffective assistance of counsel claim on direct appeal.

In response, however, the government argues that Rosario's claim reveals neither an actual conflict of interest nor one that adversely affected trial counsel's performance. Instead, the government describes the claim as one "based totally on speculation and hypothetical analysis." Having extensively reviewed and outlined the evidence on the alleged conflict of interest, we think that it is far from manifest that an actual conflict existed. While the evidence strongly indicates that there *may* have been a conflict, "a possible conflict inheres in almost every instance of multiple representation." *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718. Both parties have advanced various, plausible interpretations of the trial strategy employed by Mr. Evseroff at Rosario Gambino's trial. Consequently, we cannot approach this record with the sanguinity envisioned by *Zepp*. The narrow exception enunciated in *Zepp* is tailored to fit only those exceptional situations that lend themselves to only one conclusion— that trial counsel labored under an actual conflict of interest. Our past precedent compels us to affirm the conviction of appellant Rosario Gambino without prejudice to his ability to initiate a § 2255 collateral proceeding for the resolution of his conflict of interest claim.

---

**21.** In addition to the argument that Mr. Evseroff's failure to inform the district court of his dual representation is proof of actual conflict, Rosario Gambino asserts that his own ignorance of the existence and implications of Mr. Evseroff's dual representation "raises the question of whether [Rosario] even needs to demonstrate that an actual conflict of interest adversely affected counsel's performance." Brief of Rosario Gambino, at 30 n.*. Whatever the merits of this position to a substantive resolution of Rosario's claim, it has no bearing on our determination whether such substantive resolution is warranted on direct appeal. Cf. *Briguglio v. United States*, 675 F.2d 81, 82 (3d Cir.1982) (affirming defendant's conviction without prejudice to his right to pursue claims in a collateral proceeding despite defendant's ignorance during trial of criminal investigation of his trial attorney by the same United States Attorney's Office prosecuting the case against accused).

In *Cuyler v. Sullivan* the Supreme Court acknowledged that "[d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." The Court proceeded to note, however, that "[a]bsent special circumstances, ... *trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist.*" 446 U.S. at 346–47, 100 S.Ct. at 1717–18 (emphasis added). We think that the highlighted segment of the *Cuyler* quote is suggestive of but a few of the possibilities on which this record is silent. Absent direct evidence, we will not assume, for the sake of addressing Rosario Gambino's sixth amendment claim, that there was an actual conflict, or that counsel and clients did not "knowingly accept such risk of conflict as may exist." These issues are better explored in a § 2255 proceeding.

954

## VI.

*SENTENCING*

 Appellants urge us on various prudential and constitutional grounds to vacate their sentences and remand for resentencing. We find no merit in those arguments. Thus, absent a procedural defect or a clear abuse of discretion, we will not interfere with a sentence imposed within the statutory limits afforded to the trial judge. *See United States v. Matthews,* 773 F.2d 48, 52 (3d Cir.1985). We find evidence of neither. Accordingly, the sentences imposed by the district court shall be affirmed.