UNITED STATES of America

v.

Ronald TURCHI.

Crim. No. 79–71–2.

United States District Court,
E.D. Pennsylvania.

Sept. 17, 1986.

---

Albert J. Wicks, Philadelphia, Pa., for plaintiff.

F. Kirk Adams, Springfield, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Relator, Ronald Turchi, was convicted of conspiracy, racketeering and mail fraud arising out of the arson of three buildings. He has brought this habeas corpus petition pursuant to 28 U.S.C. § 2255 alleging various violations of his rights under the fifth and sixth amendments. Reading the issues raised in relator's petition together with those raised in his subsequently filed memorandum of law, and construing them generously, relator presents claims under four distinct legal theories: counsel's conflict of interest, counsel's incompetence, violation of fundamental fairness, and the government's *Brady* violation.

I referred this petition to a magistrate who conducted an evidentiary hearing and recommended that the habeas petition be granted on the basis that relator was deprived of his sixth amendment right to effective counsel as a result of his counsel's conflicting interests. After carefully reviewing the trial record, my files,[1] the transcript of the magistrate's evidentiary hearing, the parties' motions and memoranda of law, the magistrate's report and recommendation, and the parties' objections thereto, I must respectfully disagree with his conclusion. The magistrate rejected the relator's fifth amendment *Brady* claim. As no objections have been raised to this determination, I will not consider it here. I have considered the relator's remaining fifth and sixth amendment claims and conclude that they are also meritless.

## I. CONFLICT OF INTEREST

█ Turchi asserts three separate conflicts of interest based upon three different factual situations, each pertaining to a professional relationship his counsel had with other counsel or clients. In order to establish a conflict of interest violative of the

---

1. I have made a part of the record in this case any materials from my files which I have relied on in this opinion and which were not otherwise matters of record.

sixth amendment, relator must prove each of the following elements. First, he must show multiple representation which means that his counsel actively represented conflicting interests. Second, he must show that the representation of conflicting interests created an *actual* conflict of interest. An actual conflict of interest exists if, during the course of the representation, the conflicting interests diverge with respect to a material factual or legal issue or to a course of action. Third, he must show that the actual conflict adversely affected his counsel's performance, that is, the conflict must cause some lapse in representation contrary to relator's interests. Actual prejudice need not be shown; however, overemphasis on the presumption of prejudice does not obviate the necessity of demonstrating the existence of an actual conflict. *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984); *Cuyler v. Sullivan,* 446 U.S. 335, 342–50, 100 S.Ct. 1708, 1714–19, 64 L.Ed.2d 333 (1980); *United States v. Gambino,* 788 F.2d 938, 951 (3d Cir.1986); *Government of Virgin Islands v. Zepp,* 748 F.2d 125, 134–39 (3d Cir.1984); *Sullivan v. Cuyler,* 723 F.2d 1077, 1084–87 (3d Cir.1983).

### A. Vernile and Simone

Relator claims that his counsel, James T. Vernile, Esquire, was ineffective as a result of a conflict of interest resulting from Vernile's professional contacts with Robert F. Simone, Esquire, counsel for co-defendant Michael Morrone. To support this contention, Turchi points to the attorneys' contacts in their practice of law generally, as well as in their preparation and presentation of the defense in this case. The record reveals the following facts.

In 1972, Vernile was admitted to the Pennsylvania Bar and was employed by Simone as an associate in his law offices. As an associated attorney, Vernile used Simone's office space, facilities, and support staff to do legal work for Simone's clients. In addition, Vernile accepted other legal work which he did independently of Simone's practice and for which he made his own fee arrangements.

As time passed, Vernile's own practice grew and he had less time to devote to Simone's work. As a result, he ended his formal association with Simone and established his own practice. This change occurred prior to the time he assumed Turchi's defense in 1979 and was evidenced by the following: Vernile had his own clients, made his own fee arrangements, employed his own secretary, had his own telephone listing, used stationery with his own letterhead, and reported his own taxes.

Vernile used an office in Simone's suite where he shared with Simone certain common areas such as the library and waiting room. Vernile paid for the use of these facilities by making appearances for Simone when he was unavailable and preparing legal memoranda for Simone. Additionally, Vernile did legal work for Simone as an "independent contractor" and accepted referrals from Simone. Simone paid Vernile for matters contracted out by him and done on his behalf; Vernile's clients paid him for the work which was referred. Turchi, Vernile, and Simone each testified that Simone referred Vernile to Turchi[2] and that Turchi paid Vernile's legal fee, although there was some question as to whether Turchi gave the money directly to Vernile or whether it was delivered by Simone. The fact that Vernile was retained and paid by Turchi, independently of Simone, is further demonstrated by Vernile's post-trial desire to withdraw from the case, in part, as a result of Turchi's failure to pay outstanding expenses owed to Vernile.

At the hearing before the magistrate, prosecutor Ronald Cole, Esquire, testified that he knew that Vernile and Simone shared office space, but assumed from Vernile's letterhead that he was an independent practitioner. Cole did not know that

---

2. Vernile was only one of several attorneys Simone suggested to Turchi. Vernile apparently was Turchi's choice.

Vernile had worked for Simone in the past or that Simone had referred Turchi to Vernile. Turchi, having already been apprised of the importance of independent counsel, *see infra* at 564–565, raised no objections until the present habeas petition concerning a conflict of interest. Consequently, I, of course, was unaware at trial of Vernile's past or present professional contacts with Simone, or of any other circumstances that would urge further inquiry into the possibility of conflict.

■ The facts introduced by Turchi in the evidentiary hearing fail to establish that Vernile was either a formal or *de facto* associate in Simone's practice of law during the time of relator's trial in 1979. While the evidence indicates that Vernile and Simone had continuing professional contacts in 1979, there is no evidence that their practices were interdependent formally, financially, or otherwise. Neither is there any indication that Vernile was subordinate to Simone, or felt obligations or loyalties to either Simone or Morrone because of Vernile's professional contacts, or for any other reason.

In the absence of these concerns, which underlie the Disciplinary Rules and Ethical Considerations set forth in Canon 5 of the Code of Professional Responsibility, I will not infer that Vernile represented conflicting interests on the basis of shared office space, referrals, or unrelated work performed as payment for rent or as an independent contractor on an as-needed basis. *See United States v. Badalamente*, 507 F.2d 12, 20–21 (2d Cir.1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975) (held no conflicting interests where record showed that attorneys shared office space and secretary, but interests did not overlap in acceptance of clients or sharing of fees); *United States v. Bell*, 506 F.2d 207, 224–25 (D.C.Cir.1974) (held no conflicting interests where evidence disclosed that attorneys shared office space but practiced independently). Consequently, I conclude that there was no multiple representation.

Turchi also contends that conflicting interests arose out of Vernile's contacts with Simone during the preparation and presentation of the defense in this case. He bases this argument on the fact that Vernile, as well as the other defense attorneys, met with Simone to plan the defense together and allowed Simone to proceed first on cross-examination.

■ If this were sufficient grounds to establish multiple representation, a conflict would arise every time multiple defendants maintain a common defense. It is unrealistic to expect that defense attorneys presenting a common defense will not discuss trial strategy and procedure. In the absence of undue influence, or other facts evidencing multiple representation, it is desirable that they do so in order to present a common defense effectively and to facilitate the orderly conduct of the trial. In this case, Simone and Vernile agreed on a common defense strategy—to discredit the government's chief witness, Richard Coppola, and to blame him for the arsons. Simone went first on cross-examination because Morrone was named as the first defendant, and it was agreed that the defendants would proceed in the order that they were named in the indictment so far as opening addresses, cross-examination, and the presentation of defenses were concerned.[3]

■ There is no evidence that Simone controlled Vernile or that Simone and Vernile jointly represented their clients Morrone and Turchi. Thus, this case is distinguished from *Sullivan v. Cuyler*, 593 F.2d 512, 518–19 (3d Cir.1979), as revealed by contrasting the two cases on each of the following material facts: (1) Vernile and Simone entered separate appearances for separate clients rather than entering joint appearances on behalf of each client; (2) Vernile and Simone considered themselves independent counsel for their respective clients rather than "associate counsel" for both co-defendants; (3) Turchi paid Vernile for his representation rather than allowing

---

3. *See* N.T. July 17, 1979, at 1–54.

Morrone to pay both Vernile and Simone; (4) Vernile and Simone, with the other defense attorneys, presented a common defense but did not assist in the defense of each other's clients by making objections or arguments on their behalf or by jointly examining witnesses; (5) there is no evidence that Vernile and Simone hired one investigator or conducted one investigation; (6) there is no evidence that the two attorneys advised each other's clients concerning the course of action at trial and (7) there is no evidence that the trial strategy of the two attorneys differed or that the strategy ultimately chosen favored a co-defendant rather than relator. Consequently, I conclude that Vernile's contacts with Simone in the preparation and presentation of the defense fail to establish multiple representation.

■ Although I have concluded that neither Vernile's law practice nor trial contacts with Simone created multiple representation, which is a necessary predicate to further analysis, I will nevertheless examine the two remaining elements required to show ineffective assistance of counsel based upon a conflict of interest. For the purpose of this discussion, I will assume that relator has established multiple representation. Even so, there is no evidence that these conflicting interests ever resulted in an *actual* conflict. Turchi attempts to circumvent this requirement by characterizing circumstances as "adverse effects" and then inferring that they were caused by an actual conflict.

Turchi complains that Vernile never met with him privately to discuss the possibility of pleading guilty and cooperating with the government in order to obtain more lenient treatment. Turchi points to Morrone's criminal record and his own lack thereof and ironically contends that the weakness of his own case and the strength of the government's case make it obvious that the only reason Vernile did not suggest pleading guilty and testifying against Morrone was because Vernile's loyalties were divided by his association with Simone. Thus, Turchi asks me to infer the existence of an actual conflict—divergent interests concerning a guilty plea and cooperation with the government—from the fact that Vernile did not discuss with him these possibilities.

Turchi's argument, based entirely on inference, ignores three obvious points. First, there has been no suggestion, much less any evidence, that Vernile was unavailable or unwilling to meet alone with Turchi to discuss these options on any of the 52 days between the time Vernile entered his appearance and the date the trial started, during which time Turchi was out on bail and not in a prison cell with Morrone. On this point, what Turchi does not say is more instructive than the things he does. For example, Turchi does not say that Vernile did or said anything to indicate that they could not meet together in private, or that he did not know he could meet with Vernile in private, or that he ever wanted to meet with Vernile in private, or that he ever asked to meet with him in private and that Vernile refused. Second, Turchi seems to have forgotten that he had strategic reasons for presenting a common defense rather than hoping to curry favor by pleading guilty and testifying against Morrone. *See infra* at 567–568. Third, Turchi could have pleaded guilty, hoping to obtain a lenient sentence, without testifying against Morrone. Although the prosecutor may have wanted such testimony, that does not mean that Turchi would have had to provide it. In other words, there are many possible explanations for Vernile's failure to suggest a guilty plea or cooperation and there is no necessary connection between Vernile's conduct and any loyalty to Simone.

More importantly, the evidence negates the inference that Vernile's failure to initiate plea discussions with Turchi was the result of any conflict of interest. Vernile testified that he did not discuss a guilty plea with Turchi because Turchi maintained his innocence throughout the trial; Vernile believed Turchi was innocent; and Vernile believed that he would be able to discredit the testimony of the government's chief

witness. *See infra* 567–568. This testimony is uncontradicted and is corroborated by Turchi who testified before the magistrate that Vernile repeatedly told him not to worry about being convicted because the government did not have a case.

While in retrospect it is easy to contend Vernile should have met with Turchi alone to discuss the various options available to Turchi, it is quite another thing to conclude that because Vernile did not suggest such a meeting, he was trying to serve two masters. When a perfectly plausible reason for Vernile's omission appears on the record and is uncontradicted, I will not speculate and with the dubious aid of hindsight conclude that the failure to discuss a plea was the result of an actual conflict caused by counsel's divergent interests. Turchi's unsupported and conclusory allegations do not warrant this dangerous second-guessing and unjustifiable condemnation of counsel's motives.

Turchi's failure to support his claims with evidence of an actual conflict distinguishes this case from *Sullivan v. Cuyler,* 723 F.2d 1077, 1086–87 (3d Cir.1983), where relator's own counsel testified that an actual conflict arose concerning relator's defense strategy and counsel chose the course of action which favored a co-defendant over the relator. This case is also distinguished from *Government of Virgin Islands v. Zepp,* 748 F.2d 125, 135–40 (3d Cir.1984), where the existence of an actual conflict between counsel and relator was conclusively demonstrated by counsel's course of action at trial which could *only* have inured to counsel's benefit and to the relator's detriment. *See Gambino,* 788 F.2d at 953 (*Zepp* lent itself to one conclusion: counsel labored under an actual conflict of interest). Here there is nothing like that. There is no evidence that the decision to pursue the benefits of a common defense rather than the benefits of a guilty plea was made with anything but Turchi's best interest in mind.

In sum, even if it is assumed that Vernile's professional contacts with Simone resulted in multiple representation, Turchi has not shown a sixth amendment violation because he has not shown that an actual conflict arose during the course of the representation. Consequently, he can not show that an actual conflict caused some lapse in representation contrary to his interests.

Finally, I note that had Vernile represented multiple interests resulting in an actual conflict, it would have been brought about by Turchi's ignoring the advice that I gave him and avoiding the precautions that were taken to avoid such a conflict. On April 20, 1979, approximately one month after the indictment was returned in this case, I learned from the government's attorney that Timothy J. Gorbey, Esquire, had entered his appearance for Turchi and co-defendant, David DiStasio, that Gorbey expected to represent only one of them at trial, and that an attempt was being made to obtain counsel for the other.

On April 23, 1979, I wrote to Gorbey asking him to make every effort to have counsel for the defendant whom he would not be representing present for a pre-trial conference that was scheduled for April 30. I added that if it would be necessary for me to appoint counsel, Gorbey should let me know.

I met with all counsel on April 30. At that time, Gorbey still represented Turchi and DiStasio. Again I brought up the matter of Gorbey's representing both defendants and it was agreed that unless another attorney entered an appearance by May 7, 1979, Gorbey would on that date appear in court with Turchi and DiStasio to explain what had been done to retain another attorney. I also told Gorbey that if at that time he still represented both clients, I would appoint the Public Defender to represent one and he could represent the other. Several days after this April 30 meeting with counsel, I talked with Turchi in chambers and personally explained to him the importance of having independent counsel.

On May 1, 1979, I wrote to Gorbey to confirm our conversation of the day before and our agreement that he could not represent both Turchi and DiStasio. I also con-

firmed my understanding that Gorbey would explain this to Turchi and DiStasio. I then repeated that if additional counsel had not entered an appearance by noon on May 7, I expected Gorbey to appear with both defendants in court and I would take whatever action I felt to be appropriate.

On May 7, 1979, Gorbey appeared with Turchi. Gorbey stated that he had entered his appearance for both Turchi and DiStasio, that DiStasio wanted Gorbey to continue to represent him, that Turchi had been in touch with Stan Smuckler, Esquire, who could be expected to enter his appearance for Turchi the next day, and that consequently, Turchi did not want to have counsel appointed. Turchi confirmed that he believed Smuckler would be entering his appearance the next day.

When no appearance was entered by Smuckler or anyone else by May 11, I appointed the Public Defender to represent Turchi. Albert John Snite, Jr., Esquire, of that office, immediately began the active defense of Turchi. He signed two pre-trial motions as Turchi's counsel and on May 21, represented Turchi at a hearing concerning the Speedy Trial Act.

On May 25, 1979, Vernile entered his appearance for Turchi and trial started on July 17. During this time, Turchi was apparently unconcerned about Vernile's contacts with Simone, as he raised no objections then or at trial about a potential conflict of interest, and this despite the knowledge gained through his previous experience with Gorbey.

I have recited these matters in considerable detail in order to place into context Turchi's choice of Vernile as counsel. It is plain to me that Turchi chose to be represented by Vernile despite a complete awareness of the matters about which he now complains—that he and Vernile had never met alone together, and that Vernile and Simone shared office space—and despite his knowledge that one attorney should not represent two clients, that there were other attorneys to whom he could turn, that the Public Defender was actively

engaged in his defense and that I would take measures to prevent multiple representation. While Turchi did not expressly waive his right to independent counsel, his actions demonstrate that he knowingly accepted whatever conflict existed. *See Cuyler,* 446 U.S. at 346–47, 100 S.Ct. at 1717 ("Absent special circumstances, ... trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist.") In any event, while I find Turchi's multiple representation argument contrived and disingenuous, a waiver or assumption of risk analysis forms no part of my conclusion that there was no conflict of interest.

### B. Vernile and the Archway Owners

Turchi also claims that a conflict of interest arose as a result of Vernile's prior representation of Camillo D'Amico and Thomas Nicolucci, the owners of the Archway Tavern. Prior to assuming Turchi's defense, Vernile had represented the Archway owners in their claims to collect the insurance proceeds for the destruction of their business in the fire which was charged as one of the predicate offenses for the racketeering charges against Turchi. On this basis, Turchi argues that Vernile's interests were divided between the Archway owners and himself, and that as a result of this conflict, Vernile did not call the Archway owners as defense witnesses.

However, neither Turchi nor the record suggests how Turchi's interests differed from those of the Archway owners and I fail to see any conflict. The Archway owners were apparently willing to testify on Turchi's behalf, would have denied personal involvement, and would have denied knowledge of Turchi's involvement in the arson.[4] Turchi now argues that the Archway owners should have testified on his behalf, does not claim knowledge of their involvement, and denies any personal involvement. Far from conflicting, it appears that these interests are perfectly con-

---

**4.** I note that there is no evidence that Nicolucci would have testified accordingly.

sistent. Moreover, the Archway owners were not charged with any crime connected with the Archway fire and, thus, no conflict was presented on that basis. I therefore conclude that Vernile was not representing multiple interests.

■ Even assuming that the interests of the Archway owners and Turchi were somehow adverse, Turchi has once again failed to prove that these multiple interests emerged in an actual conflict causing a lapse in representation. Vernile testified at the evidentiary hearing that he did not recall ever considering the possibility of contacting the Archway owners concerning their testimony, much less, consciously deciding not to call them in order to protect their interests. Vernile further testified that there was nothing in his relationship with either D'Amico or Nicolucci which would have prevented him from calling them as witnesses. *Cf. Sullivan*, 793 F.2d at 1086–87 (actual conflict present when relator's attorney specifically testified that he did not call a jointly represented co-defendant as a defense witness because, though it would have aided the relator, it would have harmed the co-defendant). Turchi creates a conflict, the nature of which is left wholly to the imagination, out of the fact that apparently willing witnesses did not testify. At the same time, Turchi ignores the very real possibility that the risk of calling these witnesses to present their marginally relevant testimony may have outweighed any benefit which could have been gained. *See* discussion *infra* at 568–569.

### C. Vernile and Coppola

■ Turchi's third conflict of interest argument must also be rejected. Turchi asserts that a conflict arose as a result of a prior meeting between Simone and Richard Coppola, a co-conspirator and later a government witness, during which Coppola sought Simone's representation in a proceeding pertaining to one of the arsons subsequently charged in the indictment. Simone did not ultimately represent Coppola. However, Turchi contends that Coppola made confidential statements during this meeting which prevented Simone from effectively cross-examining Coppola, particularly concerning a prior inconsistent statement made to Simone as to the cause of the burns on Coppola's legs.

In the first place, if this were the basis of a conflict, it would be relevant to Simone's representation of Morrone, not Vernile's representation of Turchi. Vernile did not learn of Simone's meeting with Coppola until mid-trial and there is no evidence that he ever learned of Coppola's prior inconsistent statement to Simone. Thus, Vernile's loyalties and representation could not have been affected by what he did not know.

■ Assuming that Simone's supposed conflicting interests somehow extended to Vernile and Turchi, which they do not, this line of argument must nevertheless fail because no actual conflict has been shown. Not only did Coppola reveal very little to Simone during their meeting,[5] but Simone cross-examined him vigorously over a three day period, and specifically questioned him as to an identical, prior inconsistent statement made to Coppola's doctor. In addition, Simone testified that he was sure he had cross-examined Coppola as to any inconsistent statements made during their prior meeting and that their conversation did not limit him in his cross-examination. There is no evidence that Simone's failure to demonstrate that Coppola made the same prior inconsistent statement twice, rather than once, was the result of an actual conflict which Simone resolved in Coppola's favor rather than Morrone's.[6] *Accord Theodore v. New Hampshire*, 614 F.2d 817, 820–23 (1st Cir.1980) (pre-*Cuyler*

---

**5.** Simone testified that Coppola did not admit his own involvement in the arson, did not mention the names of any other participants, and was generally vague.

**6.** Turchi's contention that Simone's omission also violated the fundamental fairness doctrine of the due process clause must likewise be dismissed as it did not deprive Turchi of a fair trial.

case applying actual conflict standard; no "real conflict" where single counsel represented petitioner and co-defendant who later testified against petitioner, because petitioner failed to show that counsel was limited in cross-examination of co-defendant, that cross-examination was inadequate (3 transcript pages), or that counsel had continuing relationship with co-defendant).

## II. INCOMPETENCE

 Turchi also claims ineffective assistance of counsel based upon Vernile's alleged incompetence in two respects: the failure to discuss with Turchi his non-trial options, and the failure to call possible witnesses. In order to prove a sixth amendment claim on the basis of incompetence, Turchi must prove that, considering all of the circumstances, these omissions were objectively unreasonable at the time, that is, that they were "outside the wide range of professional competent assistance." "Judicial scrutiny of counsel's performance must be highly deferential" and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Turchi must also show that the omissions were prejudicial. To establish prejudice, relator must show that there is a reasonable probability—which is a probability sufficient to undermine confidence in the outcome—that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064–69, 80 L.Ed.2d 674 (1984). Both of relator's claims of incompetence must fail.

### A. Guilty Plea

 As previously noted, it may be said with the wisdom of hindsight that perhaps Vernile should have met privately with Turchi. Whether Vernile should have suggested such a meeting or initiated a discussion about a plea of guilty is another matter, and I can not conclude that this omission was outside of the wide range of competent, professional assistance. An attorney is not obligated to initiate plea discussions with the government in every case. *See Hawkman v. Parratt*, 661 F.2d 1161, 1171 (8th Cir.1981). It follows he is not required to initiate plea discussions with his client in every case. Moreover, these facts are distinguished from *Caruso v. Zelinsky*, 689 F.2d 435, 437–38 (3d Cir.1982), where the attorney rejected the government's proffered plea agreement without consulting the defendant and the court held that in the ordinary case counsel has a duty to inform defendant of such an offer. *Cf. Johnson v. Duckworth*, 793 F.2d 898, 899–902 (7th Cir. 1986) (noting difference between failing to communicate a plea agreement and advising defendant to plead guilty and holding that counsel acted reasonably in rejecting plea agreement from prosecutor without defendant's consent because of defendant's age, confusion and perceived incompetence). This case is also distinguished from *Hawkman*, at 1170–71, where "counsel's failure to consider the possibility of plea negotiations despite the patently duplicitous nature of the four felony counts and despite having that possibility pointed out by the state court sentencing judge constituted ineffective assistance of counsel."

In this case, Turchi maintained his innocence. At trial Turchi expressly denied involvement in any of the crimes charged in the indictment, although he admitted having participated with Coppola in one arson for which he could not longer be tried because of state law and collateral estoppel. Much was made of the honesty of his admission because, it was argued, this made the denial of his own (and the other defendants') involvement in these crimes all the more credible. *See United States v. Morrone*, 502 F.Supp. 983, 988–89 (E.D.Pa.1980) (citing *Commonwealth v. Grazier*, 481 Pa. 622, 393 A.2d 335 (1978): state law and collateral estoppel doctrine bar state arson charge where defendant acquitted of federal mail fraud charges in connection with same arson scheme), *aff'd*, 672 F.2d 904 (1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1433, 71 L.Ed.2d 652 (1982). Furthermore, Vernile believed that Turchi

was innocent. In this situation there is at least some question as to an attorney's proper role in plea discussions. *Accord North Carolina v. Alford,* 400 U.S. 25, 38 n. 10, 91 S.Ct. 160, 167 n. 10, 27 L.Ed.2d 162 (1970) (guilty pleas coupled with claims of innocence should not be accepted unless there is a factual basis for the plea); *United States v. Hecht,* 638 F.2d 651, 653 (3d Cir.1981) (acceptance of guilty plea when defendant's guilt is equivocal and a sufficient factual basis for plea is lacking would be constitutional error).

■ Moreover, Vernile believed that the government's chief witness, Richard Coppola, was not telling the truth, that Vernile would be able to demonstrate this, that the jury would find Coppola incredible and believe that it was instead he who had committed the arsons, and that the government's case was weak and would be unsuccessful. In these circumstances, Vernile's pursuit of a common defense and failure to recommend a guilty plea was professionally reasonable at the time and is entitled to deference. The fact, gained through hindsight, that Vernile's trial strategy did not yield an acquittal, does not mean that Vernile should have doubted the sincerity of Turchi's protestations of innocence under oath, nor does it render incompetent the decision to pursue that strategy rather than a guilty plea.

Additionally, relator can not show that he suffered any prejudice from counsel's failure to discuss non-trial options. Obviously, if Turchi knew of the various options that were his, Vernile's failure to initiate a discussion concerning them is irrelevant. In this regard, Turchi does not claim that he was unaware of the commonly known (but for many reasons not always attractive) possibility of pleading guilty and cooperating with the government. He does not say he wanted to plead guilty, that there was a reasonable probability that he would have pleaded guilty, or that if granted a new trial there is a reasonable probability

that he will plead guilty. He only testified that he would have considered a guilty plea and claims that counsel was incompetent for failing to suggest it.

■ This evidence falls short of proving a reasonable probability that but for counsel's omission Turchi would have pleaded guilty or the government would have entered into a plea agreement. *See e.g. Hill v. Lockhart,* —— U.S. ——, 106 S.Ct. 366, 369–71, 88 L.Ed.2d 203 (1985) (held *Strickland* standard applies to plea process; no prejudice shown where defendant pleaded guilty upon counsel's erroneous advice because defendant did not show reasonable probability that but for counsel's error he would not have pleaded guilty and insisted on going to trial); *Johnson v. Duckworth,* at 902 n. 3 (citing *Hill,* court expressed serious doubt as to whether petitioner's after-the-fact testimony regarding his desire to plead guilty by itself would be sufficient to establish that prior to trial, but for attorney's actions, there was reasonable probability petitioner would have pleaded guilty); *United States v. Fisher,* 772 F.2d 371, 373–74 (7th Cir.1985) (incompetence argument rejected where defendant could not show that counsel's failure to advise as to the possibility of a conditional guilty plea caused him any prejudice: it did not preclude him from pleading not guilty and proceeding to trial and it did not prevent him from striking a better plea agreement with the government).

### B. Defense Witnesses

■ Vernile's failure to call the owners of Archway Tavern, or Ronald Essner, the owner of the building in which Archway was located, was neither professionally unreasonable nor prejudicial. Turchi, charged with committing arson had little to gain by putting the owners of the burned property on the stand. At best these witnesses purportedly would have testified that they did not know Turchi, that they did not hire him to burn their property, and that they did not know who burned it.[7]

---

7. There is no evidence that Essner would have testified or what his testimony would have been.

*See also supra* note 4.

Because the predicate offenses were arson, and not arson for hire, and because there is not reason to expect an arson victim to know the identity of the arsonist, the relevancy and importance of this evidence is questionable.

At worst, Turchi risked the possibility that the government would elicit damaging evidence from these witnesses on cross-examination.[8] The Archway owners, having already been the focus of some suspicion, were investigated but not charged with involvement in the arson. Turchi would hardly want to accentuate this fact, or invite their participation, in a trial which included the other owners of burned property as co-defendants, only to obtain their (not surprising) testimony that they did not hire Turchi to burn their business.

In sum, relator has failed to prove a violation of his sixth amendment right to effective assistance of counsel based upon either a conflict of interest or incompetence. He has also failed to prove a violation of his fifth amendment right to fundamental fairness under the due process clause. Accordingly, his petition for habeas corpus must be denied.

---

8. On this point it is noteworthy that Simone testified that while he did not specifically recall the reason he did not call the Archway owners, it is his general opinion that defense witnesses lose a case more often that they win one and, consequently, it is his general practice not to call defense witnesses.